For these reasons, I would affirm the decision of the Department of Commerce Appeals Board, both in result and reasoning, and therefore would deny both motions for summary judgment.

KASHIWA, Judge, concurs in Judge Davis' dissent.

**MIAMI VALLEY BROADCASTING COR-PORATION and Carolina Broad-casting Company**

**v.**

**The UNITED STATES.**

**No. 236-68.**

United States Court of Claims.

June 19, 1974.

Bernard J. Long, Jr., Washington, D. C., for plaintiff; Richard L. Braunstein, Washington, D. C., attorney of record. Dow, Lohnes & Albertson, Washington, D. C., of counsel.

Joseph Kovner, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, for defendant. Gilbert E. Andrews, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS, and KUNZIG, Judges.

## OPINION

DAVIS, Judge.*

Plaintiffs seek judgment for $866,166.97, with interest, for refund of alleged overpayments of federal income tax and assessed interest for taxable years 1959, 1960, 1961 and 1962. They paid the amounts of tax as computed on their returns for such years, and also the deficiencies and interest, as assessed or determined by the Internal Revenue Service; timely filed claims for refund for those years, which were denied; and thereafter timely filed their petition, seeking relief on the same grounds asserted in their claims.

Plaintiff Carolina Broadcasting Company (Carolina) is and was a wholly owned subsidiary of plaintiff Miami Valley Broadcasting Corporation (Miami Valley), respectively corporations of Delaware and Ohio. They filed consolidated income tax returns for the years 1959–1961, and Carolina filed its separate return for 1962. The tax liabilities in issue arise out of the business affairs of Carolina, and Miami Valley is a plaintiff only because of the filing of the consolidated returns.

On May 14, 1959, after obtaining approval of the Federal Communications Commission (FCC), Carolina purchased all of the outstanding stock of WSOC Broadcasting Company (WSOC company) for an agreed price of $5,600,000. WSOC company was a corporation which owned and operated radio and television stations WSOC–AM, FM, and TV, broadcasting at Charlotte, North Carolina. The stockholders of WSOC company were the sellers of the entire business of that company.

* Parts II and III of this opinion incorporate, with minor additions and with modifications needed to adjust to our conclusions in Part I, the relevant segments of the opinion of Trial Judge Hogenson. In Part I, A, we agree with the trial judge's conclusion with a modification; in Part I, B, we come to a different result. We adopt, with changes reflecting our conclusions in this opinion, the trial judge's numbered findings of fact, but we think it unnecessary to print them for general distribution.

Effective June 1, 1959, WSOC company was liquidated in accordance with the provisions of 26 U.S.C. §§ 332 and 334(b)(2), and all of its assets were distributed to and all of its liabilities assumed by Carolina. Those assets and liabilities related to the operation of the radio and television stations and that business continued without interruption under direct control of Carolina upon liquidation of WSOC company.

On June 1, 1959, Carolina's total adjusted cost basis of the WSOC company stock, to be allocated to the assets acquired from WSOC company, was $6,719,696, which included the $5,600,000 paid for the stock and $1,199,696 in liabilities assumed in the liquidation.

Section 1.334–1(c)(4)(viii) of the Treasury Regulations provides that, upon complete liquidation of a subsidiary under 26 U.S.C. § 334(b)(2), the parent corporation's adjusted basis in its subsidiary's stock is to be allocated among the various assets received (except for cash and its equivalent), both tangible and intangible (whether or not depreciable or amortizable), in proportion to the net fair market value of such assets on the date received.

The parties are in agreement that, after deduction of $193,122 in cash and $231,348 in accounts receivable distributed to Carolina in the liquidation, Carolina's adjusted cost basis to be allocated to all other assets, tangible and intangible, was $6,295,226. The parties further agree that the amounts allocable to two items of intangible assets, i. e., the transmitter site lease and the film contracts, were respectively $84,076 and $209,917, leaving a balance of $6,001,233.

This balance of $6,001,233 remains for allocation to all other assets, i. e., the tangible assets and the following intangibles: NBC television network affiliation contract, ABC television network affiliation contract, the NBC radio network affiliation contract, and the FCC radio and television licenses. (The radio network affiliation contract and the

radio licenses had only minimal values in relation to the other intangibles, because of lack of past and prospective profitability of the radio operations.) Essentially this case involves the allocation of this $6,001,233 among these assets for tax depreciation and amortization purposes.

### I

The tangible assets are the land, improvements, technical installations, equipment and supplies, and other physical items, all of which constituted the well-designed, completed, tested and fully operational plant and facilities existing in the operations of WSOC–AM, FM and TV, as of June 1, 1959. The first question before us concerns the basis for depreciation of these tangible assets during the taxable years; the Internal Revenue Service disallowed depreciation deductions calculated by taxpayers on a higher basis than the Service thought proper.

A. The reproduction cost of each of the separate tangible assets is not in dispute, being in the amounts set forth in finding 6, totaling $2,178,072 for all the assets. Defendant argues that that sum is the amount to be allocated to the tangible assets. The reproduction costs of those assets included catalogue prices, labor, freight, sales tax and supervision, but did not contain any element of increase in value because such assets were parts of an assembled and operating plant. The Government argues that, at least in this instance where the physical assets were practically new, already assembled, and in good working order, nothing should be added for so-called "turnkey value"—the value of an equivalent plant with guaranteed equal performance.

The answer lies, we think, in Section 1.334–1(c)(4)(viii) of the Regulations, *supra*, which refers us, for this basis allocation, to the net fair market value of the tangible assets—not to the seller's cost or even for that matter the buyer's actual cost. Reproduction cost can be an

adequate measure of fair market value, especially where as here there is no real market,[1] since that is what the buyer would have to pay if he did not purchase the particular item from the seller but had it replaced by fabrication or construction (1 J. Bonbright, Valuation of Property 156–57 (1937)).

By the same token, we agree with plaintiffs that fair market value would take into account the fact that this buyer received (and was entitled under its contract to receive) a put-together plant in good all-round working shape, not a congeries of uncoordinated physical assets liable as not to fail to work as a unit. The "turnkey" product was worth more than the sum of the untested and uncoordinated parts, even though they were all constructed and installed in place. Normally a buyer would 'pay an increment for such an assurance that the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination.

In this case the total of the itemized reproduction costs for the individual items did not include any charge related to (or market value based upon) this "turnkey" guarantee that a fully tested and operational plant was and would be available to be handed over. The overhead, contingencies and profit included in those individual sums appear to cover only the costs of the contractor's and subcontractor's work on the individual items. The charges of a "turnkey contractor", with responsibility for overall supervision and coordination of the complex project, are not reflected in the tabulation. If Carolina had to obtain an equivalent plant with guaranteed equal performance, the cost of that plant would in all probability have included the total of the reproduction costs of the individual assets ($2,178,072), plus increments covering construction interest, and the contractor's contingencies, overhead and profit for the "turnkey" aspect.

It makes no difference on this point that the plant was virtually new, or that the seller (the WSOC company) may not have paid such "turnkey" costs to someone else, or that "turnkey" contracts may not be a general industry practice, or that the Cox chain (of which plaintiffs formed a part) never used such contracts. We are determining the fair market value of this plant and these tangible assets which plaintiffs actually received in the spring of 1959, in the state in which they were acquired—not what the seller had paid out or what plaintiffs and the broadcasting industry may do in other circumstances. If the seller of this property did not pay out "turnkey" costs to another, it assumed or bore them itself in this instance, and would undoubtedly seek to charge its buyers for them if it could. The fact that the plant was new would be irrelevant if, as we think clear, the cost and worth of a new "turnkey" plant exceeds that of a new plant which has not been tested and coordinated, and is not guaranteed to be in good working shape. There is no sound reason to believe that plaintiffs or any other purchaser of these assets in the Charlotte market would not have paid such an increment in 1959 in order to obtain the plant in its then operating condition.

Plaintiff's appraiser, Horace W. Gross, arrived at a total reproduction

---

1. Contemporary sales of comparable property have been recognized as normally the reliable and preferable test of fair market value. But that approach seems inapplicable to the market value of a broadcast business, or to its tangible or intangible assets, because the nature of the broadcast industry is that incomparability is the hallmark of individual radio and television stations, not only from market to market throughout the country, but even within any given market or area.

Reproduction cost, basically used by the appraisers in this case to assess the fair market value of the tangible assets and accepted by both sides, is a relevant factor when reasonably applied, but it must be recognized that in certain circumstances fair market value may be more or less than the strict reproduction cost of the property appraised. Jack Daniel Distillery v. United States, 379 F.2d 569, 578, 180 Ct.Cl. 308, 323 (1967).

cost of the tangible assets of $2,696,-964—$518,892 above the total reproduction costs of the individual assets —which he termed "turnkey value." He used the agreed reproduction costs of the individual assets and added costs which would have been incurred in their assembly into a fully operational plant under a turnkey contract with guaranteed performance.[2] No element of profitability was included in such computation, except, of course, the profit to be realized by the contractor on the construction project.

■ Mr. Gross' assessment of the total reproduction cost was accepted by the trial judge as reasonable and sufficiently accurate. We have no ground for rejecting the trial judge's general appraisal of this evidence. He did reduce the total to $2,600,000 because the WSOC plant and facilities had been in operation for about 2 years and some minor wear and tear would have occurred, but plaintiff correctly observes that the appraiser's assessment already took account of depreciation (insofar as it had occurred) and that at the trial stage defendant did not seek any reduction from the total of the reproduction cost figures for the individual items. In those circumstances the reduction was not warranted. We therefore find the total reproduction cost (including the "turnkey" factor) to be $2,696,964.

B. To his total reproduction cost of $2,696,964, Mr. Gross added almost $1 million to arrive at his total fair market value of all tangible assets in the sum of $3,636,783, which he termed the "immediate use value" as of June 1, 1959. He based this increment on the financial benefit to be derived by Carolina from the immediate and continuing use of the broadcast facility during the period after June 1, 1959, which would have been required to construct an equivalent plant. Such a construction period would have been 2 years, absent lengthy delays.

The television industry was affluent in 1959, there was considerable demand for broadcasting equipment, and some delays were reasonably to be expected.

In the appraiser's view, the financial benefit to be derived from immediate and continuing broadcast operations over the 2-year construction period was primarily that Carolina would realize net earnings and cash flow which would otherwise be lost during such period, and also that Carolina could increase its rate of earnings during such period to a point above that which could be expected at the commencement of operations delayed to the end of the construction period, and that Carolina would effect savings in unproductive overhead, such as salaries and taxes, which would be incurred in such period.

The trial judge considered the increment sought by taxpayers to be too high but he accepted an additional sum of $600,000 (over and above the total reproduction cost, including the "turnkey" increment) as part of depreciable fair market value of the tangible assets. We cannot agree that in this case any extra sum is allowable (over total reproduction cost) for the purposes of depreciation.

■ Insofar as this additional amount is intended to reflect the increased value of the individual tangible assets because they were assembled, installed, integrated, tested, coordinated, and in operating order, that type of increment is already reflected, as shown *supra,* in our figure for total reproduction cost. To the extent that the extra $600,000 (or more) is thought to represent pure goodwill, it is of course not depreciable or amortizable. Winn-Dixie Montgomery, Inc. v. United States, 444 F.2d 677, 683 n. 8 (5th Cir. 1971); *cf.* Meredith Broadcasting Co. v. United States, 186 Ct.Cl. 1, 18–21, 405 F.2d 1214, 1224–1225 (1968).

■ If the supplement stands for a separate "going concern value"—in the

2. Defendant challenges Mr. Gross' "turnkey" increments but on this record we consider them reasonable. The witness explained the

items and there was no contradictory testimony or evidence.

sense of the special value inherent in a functioning established plant continuing to operate, to do business, and to earn money, with its staff and personnel—then that element, too, is not to be considered as an enhancement in the market value of depreciable assets for the purposes of depreciation. United States v. Cornish, 348 F.2d 175, 185–186 (9th Cir. 1965); Winn-Dixie Montgomery, Inc. v. United States, *supra*, 444 F.2d at 685; Northern Natural Gas Co. v. United States, 470 F.2d 1107, 1109–1110 (8th Cir.), cert. denied, 412 U.S. 939, 93 S.Ct. 2773, 37 L.Ed.2d 398 (1973). As the Eighth Circuit said in Northern Natural Gas Co.:

> This allowance for depreciation is intended to provide a nontaxable fund to restore income-producing assets at the end of their useful life and their capacity to produce income has ceased or, to allow a taxpayer to recoup his investment in wasting assets free of income tax. [citation omitted] With this in mind, we conclude that the basis for depreciation of a purchaser of a going concern should not include the "enhanced" portion of the acquired assets' value. Though the assets of a going concern may have a greater actual value when acquired in their combined form and therefore cost more to acquire, at the end of these assets' useful life they will not be separately replaced with new tanks and cylinders [the assets in that case] with like enhanced value, but only by tanks and cylinders at the ordinary prices of suppliers. The going concern value or enhancement in the assets' value re-

mains and is independent of the exhaustion of the individual assets. See *Cornish, supra* [348 F. 2d] at 185.

We do not view our holding as being in conflict with [Int.Rev.Code] § 1012 which dictates that the basis for depreciation shall be the cost of the acquired property. This was not a transaction involving the purchase of assets with a fair market value of X dollars which, following the end of their useful life, will be replaced by like assets of similar cost. Here, the acquired assets carried additional value due to their being combined in a particular manner in a going concern and this additional value will not depreciate but will continue to exist possibly for the life of the business which acquired the assets.

For this reason a "going concern" component cannot be used, for depreciation purposes, as part of the basis of the depreciable tangible assets.[3]

■ Taxpayers argue that the increment here does not represent such "going concern value" but rather the element of immediate availability or immediate use value, *i. e.* the ability to have and to use the plant on June 1, 1959, rather than to have to wait some two years for its equivalent to be reproduced. It is said that, unlike the present case, in *Northern Natural Gas Co.* and *Cornish* (the leading cases on the non-depreciability of an increment for "going concern value") there was no contention or showing that replacement of the assets would take time or be delayed. Here the construction of an

---

3. Aside from two unclear Tax Court memorandum decisions which may have been referring primarily to "turnkey" value (Philadelphia Steel & Iron Corp. v. Commissioner, 23 T.C.M. 558, 564 (1964); WEG Dial Telephone, Inc, v. Commissioner, 25 T.C.M. 233, 242 (1966)), there are no contrary rulings. Los Angeles Gas Co. v. R. R. Commission, 289 U.S. 287, 307, 313, 53 S.Ct. 637, 77 L. Ed. 1180 (1933), did not deal with tax depreciation but with the value of a utility for rate-making purposes. Similarly, Perrault v. Commissioner, 25 T.C. 439, 451 (1955), aff'd

per curiam, 244 F.2d 408 (10th Cir. 1957), cert. denied sub. nom. Gunn v. Commissioner of Internal Revenue, 355 U.S. 830, 78 S.Ct. 41, 2 L.Ed.2d 42 (1957), did not involve the addition of "going-concern value" to the depreciable basis of physical assets but enhancement of the value of a machine by a necessary patent. In Commissioner of Internal Revenue v. Seaboard Finance Co., 367 F.2d 646, 650–652 (9th Cir. 1966), there was no issue as to the amortizability or depreciability of "going concern value" which the Tax Court had held not depreciable.

equivalent plant would consume at least two years.

The difficulty is that, assuming that such an "immediate use value" can sometimes enhance the fair market value of a tangible depreciable asset (*see* 1 J. Bonbright, Valuation of Property 157–58 (1937)), plaintiffs have not proved this to be such a case. Professor Bonbright warns that "the practical difficulties of estimating in monetary terms those losses which would result from the delay are likely to be so serious that an appraiser or a court will not attempt it", and he pointed out that the common law tends to limit the appraisal to replacement cost "through its vaguely defined restrictions against allowances for consequential speculative damages, speculative values, or lost opportunities to make a profit." *Ibid.* This view cautions that, to be allowable at all, "immediate use value" must be shown persuasively and clearly, and by a proper measure.

■ The overall criterion is, as we emphasize again, fair market value, and we are not persuaded either (a) that in 1959 a "willing buyer—willing seller" negotiation for this plant would have added an appreciable sum over total reproduction cost (including the "turnkey" increment) for "immediate use", or (b) that even if such an increment would have been added it would be measured by the anticipated profits from the plant during the next two years. This is not, so far as we know, an instance in which buyers would be desperate or exceedingly anxious to obtain this plant at once;

though plaintiffs wanted to enter the Charlotte market, there is no adequate showing that they were so intent on entering only that market, and entering it in the spring of 1959, that they (or any other purchaser) would have paid a significant sum above total reproduction cost for this particular plant at that particular time.[4] Combined with this great factor of doubt is the unlikelihood that, if any increment were added at all, plaintiffs would agree to have it gauged by the "lost" profits of an equivalent plant for the next two years; there is no reason to believe that if the taxpayers had had to wait for two years for a plant they would not have used their capital to good advantage in some other or substitute endeavor to make up at least a good part of these so-called "lost" profits.[5] Fair market value of the tangible property would not be enhanced, if at all, by the full amount of the so-called "lost profits." Indeed, the use of full profitability as the measure smacks of "going concern value" rather than an "immediate use" increment—and there is much in the evidence and the trial judge's discussion to suggest that a proper separation between the two concepts was not maintained in the presentation and consideration below.[6]

We are led by these grave doubts to hold that in this case plaintiffs have failed to prove the existence of any excess value in the tangible assets attributable to freedom from delay and, if any did exist, a correct standard of measurement.[7] The fair market value

4. Plaintiffs would add an increment of almost 40%. The trial judge's increment would be about 26%; he lowered plaintiff's figure only because he thought a portion of the added value, attributable to the expected profitability during the 2-year period, should be assigned to the intangible assets.

5. The WSOC company seems to have operated its television station out of temporary or makeshift quarters until its television studio building was completed and equipped in January 1959.

6. Defendant's two experts each added an increment to the reproduction cost of the individual items. It is quite unclear how much

and whether these increments represented "going concern value" (which we have held *supra* to be unallowable for depreciation purposes as a matter of law, even if proved as fact) rather than "immediate use value." It is also unclear how much of the increment, if any, the witnesses deemed depreciable. In any event, the court is not bound by such opinion testimony. Sternberger v. United States, 401 F.2d 1012, 1016, 185 Ct. Cl. 528, 535–536 (1968).

7. In their last briefs to the court, taxpayers refer, alternatively, to the "two year time saving" as a separate intangible asset amortizable over the two years. Without decid-

of the tangible assets must stand at $2,696,964.

II

The next set of issues involves the duration for amortization purposes of the ABC and NBC television affiliation contracts.[8]

Since the expiration of the DuMont television network in 1955, there have been only three national commercial television networks, CBS, NBC and ABC. They have been the major source of high-level competitive programming for local stations. During the 1960's, CBS accounted for about 40 percent of all television network revenues. As between NBC and ABC, NBC has been stronger in overall program popularity and network service.[9]

Generally, in any market where the number of television stations is the same or greater than the number of networks, and where there are at least three competitive stations, each of the three networks enters into an exclusive affiliation contract with one television station in that market. This is a standard primary affiliation contract for which the station does not pay the network. Such contract provides *inter alia* that: (1) the network, at its own expense, will provide programming to the station; (2) the network promises the station to offer it first call for all programs broadcast in that community; and (3) the network agrees to pay the station a specified percentage of the station's network time rate paid to the network by the national advertiser sponsoring the network program.

Commercial television is dependent upon revenues from advertisers. Advertisers seek large audiences, and the popularity of television programs is of paramount importance to them, whether on a national, regional or local basis. Network programs generally have substantially exceeded local programming in popularity, and network affiliated stations have in general attracted much larger audiences than independent stations in the same market. Only in the very large markets, such as New York City, Chicago, San Francisco-Oakland, and Washington, D. C., have independent stations been able to attract audiences comparable to those of affiliated stations, and thus to attain comparable revenues. For the various reasons detailed in the findings of fact herein, the economics of the television industry is such that generally an affiliated station has substantially greater advertising revenues and profits than an independent station in the same market. One very important factor is that an affiliated station not only receives its share of the revenues from the sale of network time to national advertisers, whose announcements are interspersed throughout a network program, but also revenues from sale by such station (without network involvement) to national and local advertisers of the highly lucrative adjacencies to network programs, the intervals of time reserved to the affiliated station between network programs or between segments of long network programs. The use by national advertisers of adjacencies is called "national spot" advertising, sold by an advertising agency or agencies of the local affiliated station, subject only to a sales commission.

Network affiliation is such a powerful factor in the concentration of profitability in the television industry that the re-

ing that this issue is properly before us, we note that for the reasons given above plaintiffs have failed to prove the existence or worth of any such intangible.

8. This Part incorporates, with our conclusion, the portion of Trial Judge Hogenson's opinion relating to these issues. The court agrees with and adopts this part of his opinion.

9. An excellent summary of the basic elements of television broadcasting and the contractual relationships between the television networks and local stations is set forth in this court's opinion in Meredith Broadcasting Co. v. United States, 405 F.2d 1214, 1216–1220, 186 Ct.Cl. 1, 4–11 (1968).

lationship between each television network and one local station in a given market, as extended throughout the nation, has been termed an oligopoly. However, the national network systems stem in substantial part from the circumstance that only a few of the 12 very high frequency (VHF) channels are available for television broadcasting in a given market, and despite the availability of 70 ultra high frequency (UHF) channels in recent years, television networks have continued to favor VHF stations, because UHF commercial stations have generally failed to become competitive for technical and other reasons.

On the date of liquidation of WSOC company, June 1, 1959, there were only two commercial television stations operating in the Charlotte, North Carolina, market. These were both VHF stations, one being subject station, WSOC–TV (Channel 9), and the other WBTV (Channel 3). No other VHF station has ever operated in that market. In 1961, the FCC refused to allocate another VHF channel there.

The strongest of the two stations was WBTV, which commenced operations in July 1949. Until 1957, when subject station commenced operations, WBTV maintained network affiliations with all three television networks, but thereafter was exclusively affiliated with CBS.

Subject station, WSOC–TV, began broadcasting in April 1957, and immediately obtained primary affiliation contracts with both NBC and ABC, maintaining such dual affiliation until September 30, 1967, when it terminated the ABC contract, and thereafter has had exclusive affiliation with NBC.

In November 1964, UHF commercial station WCCB–TV (Channel 18) commenced operations in the Charlotte market, and has remained in continuous operation since that time. When WSOC–TV terminated its ABC contract in 1967, WCCB–TV became and has remained affiliated with that network.

The only other commercial television station ever broadcasting in the Char-

lotte market was another UHF station, WCTU–TV (Channel 36), which began broadcasting in July 1967, and has continued to the present time, being an independent station, unaffiliated with any network.

Since the advent of television, the FCC has sought to provide multiple competitive television broadcasting in the larger cities, and in particular has attempted in each of the top 50 markets, which on June 1, 1959, included Charlotte, North Carolina, as the 25th market in audience size, to provide at least three competitive television stations. ABC, having a lesser number of affiliated stations than CBS and NBC, has consistently exerted pressure toward that end, obviously supported nationwide by its affiliated stations.

In 1952, the FCC allocated 70 UHF channels to television, and expressed the hope that the UHF band would be fully utilized, and that UHF television stations would compete on a favorable basis with VHF as an integral part of a single, nationwide television service. It was even contemplated that commercial television might be transferred from the VHF to the UHF band.

In the late 1950's, it had become apparent that UHF television had not become competitive with VHF, and the FCC proposed allocation of a third VHF station in a number of markets, including Charlotte, North Carolina, although such proposal was rejected in 1961.

In 1959, the FCC recommended the enactment by Congress of the All-Channel Receiver legislation, prohibiting shipment in interstate commerce of new television sets not equipped to receive both VHF and UHF signals. UHF television broadcasting had been seriously handicapped by the paucity of home sets equipped to receive its signals. Such legislation was, of course, enacted in time by Congress.

Considering the circumstances existing in the Charlotte, North Carolina, market, and in the light of the actions and announced policies of the FCC, it

was reasonably predictable as of June 1, 1959, that within 10 years, a third commercial television station would become established and competitive in such market, that there would then be a restructuring of such market in the normal pattern of each television network being exclusively affiliated with one television station, that CBS would remain exclusively affiliated with the strongest station WBTV, that WSOC–TV (by Carolina) would move to make a choice between NBC and ABC for an exclusive affiliation, that both NBC and WSOC–TV would prefer and accomplish exclusive affiliation between them, and that ABC would be left to affiliate with the new competitive station in the market. These expectations actually came to pass.

▆ From all of the evidence in this case, it is found that the ABC television network affiliation contract with WSOC–TV had a reasonably predictable life of 10 years as of June 1, 1959, with amortization of the cost basis of that asset to be computed accordingly during the taxable years in suit. The Internal Revenue Service disallowed claimed amortization deductions for the ABC network contract.

With respect to WSOC–TV's television network affiliation contract with NBC, however, it is concluded that plaintiffs are not entitled to amortization deductions on Carolina's allocable cost of that asset during any of the taxable years in issue, because the testimony and evidence fail to establish that such affiliation contract had a reasonably ascertainable future life. Commissioner of Internal Revenue v. Indiana Broadcasting Corp., 350 F.2d 580 (7th Cr. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 645, 15 L.Ed.2d 539 (1966); Westinghouse Broadcasting Co. v. Commissioner of Internal Revenue, 309 F.2d 279 (3d Cir. 1962), cert. denied, 372 U.S. 935, 83 S. Ct. 881, 9 L.Ed.2d 766 (1963); Roy H. Park Broadcasting, Inc., 56 T.C. 784 (1971); Gulf Television Corp., 52 T.C. 1038 (1969).

Plaintiffs' position, controverted by defendant, is that the NBC television network affiliation contract had a useful life of not more than 30 years from June 1, 1959, seeking to have this court adopt the theory of plaintiff's expert witnesses, opposed by defendant's expert witnesses, that whether or not WSOC–TV's affiliation with NBC terminates by 1990, the economic characteristics of such affiliation contract will be so different that it must be considered an entirely different asset than the contract acquired by Carolina in 1959, and that the value which Carolina paid for such contract in 1959 will have been exhausted by 1990. The factual basis for plaintiffs' predictions in this respect is set forth in the extensive findings of fact. Basically plaintiffs' argument is that in the light of the pronouncements and actions of the FCC to foster competition and attain diversity of programming in television broadcasting, the growth of competitive television outlets, both commercial and otherwise, and natural forces inherent in commercial television must inevitably eliminate the network-affiliate oligopoly. Plaintiffs state that they expect the television networks and their affiliates to continue to operate profitably, but that the value of a television station's affiliation with a network will be exhausted in the time indicated.

The competitive forces upon which plaintiffs rely are in the main the pronouncements of the FCC against the control of supply of television programming by the three networks, FCC actions toward providing greater competition and additional outlets within a given market, the availability of the UHF band for licensing and operation of additional stations, and the nature, state of development and competitive potential of noncommercial public or educational television (PTV), subscription television (STV), and cable or community antenna television (CATV).

Upon careful consideration of the opposing opinions of the expert witnesses, and upon consideration of all of the evi-

dence in this case, it is concluded that the record as a whole persuasively indicates that, as of 1959–1962, the NBC television network affiliation contract might be expected to remain in force for a wholly unpredictable period of time, and that the value of such contract would not be exhausted by any reasonably ascertainable time. The findings detail the facts as to the status of PTV. STV, and CATV, and the other circumstances which plaintiffs invoke. Suffice it here to say that we are not at all convinced by the plaintiffs' predictions that, as of 1959–1962, the demise of network power was foreseeable by 1990 (or any other date). The preponderance of the evidence is to the contrary.

### III

There remain the questions of the allocation of cost basis to the television network affiliation contracts and to the FCC television license.[10]

Plaintiffs would have the court allocate $3,600,000 to the tangible assets (but see Part I, *supra*), thus leaving about $2,400,000 for allocation to the radio and television network affiliation contracts and the FCC radio and television licenses. Plaintiffs seek to have 90 percent of the residual sum (or about $2,200,000) allocated to the television network affiliation contracts with 55 percent of the latter sum to the NBC contract and 45 percent to the ABC contract. Thus, plaintiffs would have only about $200,000 allocated to the FCC television license and to the NBC radio network affiliation contract and radio licenses. Disregarding the radio network affiliation contract and the radio licenses, defendant seeks to have 80 percent of the residue (over the allocation to the tangible assets and other agreed values) allocated to the FCC television

license, 14 percent of the residue to the NBC television contract and 6 percent to the ABC contract.

The NBC radio network affiliation contract and the FCC radio licenses had minimal values. Neither of such intangibles is shown to have an ascertainable future life, which is also the case with respect to the FCC television license and the NBC television network affiliation contract. Consequently the radio contract and the radio licenses are lumped respectively with the NBC television network contract and the television license in allocating basis to the three remaining intangibles, *i. e.*, the two network television contracts and the FCC television license.

The adjudicated cases cited by the parties furnish little in the way of guidelines for the allocation of basis to the intangibles in this case, but rather indicate that the determination must be made largely on the facts and circumstances peculiar to each case. Mathematical precision is impossible, and the broadest kind of estimates must be made. Meredith Broadcasting Co. v. United States, 405 F.2d 1214, 1227, 186 Ct.Cl. 1, 24 (1968). See Roy H. Park Broadcasting, Inc., *supra*; Indiana Broadcasting Corp., 41 T.C. 793 (1964), rev'd on other grounds, Commissioner v. Indiana Broadcasting Corp., *supra*.

Within the framework of the evidence adduced in this case, it is concluded that plaintiffs and defendant both seek unreasonable allocations in furtherance of their purposes, and that the percentages of the residue fairly and reasonably allocable to the three intangibles as of June 1, 1959, and during the taxable years in suit, are as follows: NBC television network affiliation contract, 39%; ABC television network affiliation contract, 26%; and the FCC television license, 35%.

10. This Part incorporates the portion of the trial judge's opinion dealing with these matters, with the computation modifications made necessary by our conclusions in Part I, *supra*. Except for these changes in compu- tation, the court sees no adequate reason to depart from the trial judge's considered allocation and therefore adopts his discussion of these matters.

In Meredith Broadcasting Co. v. United States, *supra*, this court stated in the light of the facts and circumstances of that case that an FCC television license is, from a practical standpoint, a more permanent arrangement than network affiliation contracts, rejecting as unpersuasive the taxpayer's argument that the license had no value, that it was merely a license to lose money, and that profitability of operations should not be ascribed to the license, but rather to the network affiliation contracts. Nevertheless, the court recognized that the network affiliations had substantial value, even though there was considerable chance that they would continue to exist for only a relatively short period of time, as proved to be the case. The court allocated remaining basis 50 percent to the television network affiliation contracts, 35 percent to going concern value (including the licenses), and 15 percent to television advertising contracts.

An FCC television license has value in relation to its use in profitable, or potentially profitable operations. It can be transferred from one holder to another only with the approval of the FCC which administers a stringent policy against trafficking in broadcast licenses. In the circumstances existing in the Charlotte market, the WSOC television license had substantial value, because the WSOC operations had been and were reasonably expected to be profitable. However, such license did not have overwhelming value merely because the WSOC television operations would not have existed without the license.

It is clearly established in this case that the profitability of the WSOC–TV operations, established as of June 1, 1959, by experience over the preceding 2 years, and reasonably expected to improve thereafter, was due to its television network affiliations. WSOC–TV's most valuable intangible assets were its NBC and ABC television network affiliation contracts. Unlike the gamble involved in the *Meredith* case, WSOC–TV reasonably could expect, as we have found, to retain the ABC affiliation for 10 years and the NBC affiliation indefinitely and much longer.

Of course, with WBTV exclusively affiliated with CBS, and with no other competitive station in the Charlotte market, WSOC–TV was assured of affiliations with NBC and ABC for the asking and without cost in 1959. Obviously the sellers of WSOC–TV would not have operated their television broadcast business without obtaining such readily available affiliations, and they must have regarded such affiliations as valuable assets of their business. The actual existence of such affiliations, as well as their ready availability and prospective long lives, figured prominently in the decision of the buyer to purchase, and the buyer and sellers must have given full consideration to these circumstances in fixing of the agreed purchase price. It cannot be found that such affiliations had little or no value, because they could have been readily obtained by the buyer without cost, assuming unrealistically that they did not exist at the time of the sale agreement in 1959.

The detailed facts which establish the prospective profitability of the WSOC–TV operations are set forth in the extensive findings of fact made in this case, repetition of which would unduly prolong this opinion.

Mention must be made, however, of the circumstance that in the appraisal report prepared by Horace W. Gross for plaintiff in 1959, the fair market values of the NBC and ABC television network affiliation contracts were determined respectively to be only in the sums of $665,990 and $471,476. These low values stemmed from mistaken assumptions that such contracts would terminate in 1963.

In his testimony before this court in 1971, Mr. Gross stated that if he had assumed in 1959 that the ABC contract

had a life of 8 years (and it was in fact terminated in 1967) and that the NBC contract then had a 30-year (as plaintiff now argues), or even an indefinite life, he would have valued such contracts respectively over 8- and 10-year periods. The use of the 10-year period for the NBC contract, he explained, was because a buyer would seek to recover his investment in the television station within that period of time, as was said to be usual in the industry.

Based on 8 years for the ABC contract and 10 years for the NBC contract, he calculated that such contracts had a total value of $2,194,000 in 1959. In doing so, he took the 1958 television network revenues of WSOC–TV ($307,379 from NBC and $198,521 from ABC), the basis of his appraisal in 1959, and by increasing the 1958 network revenues from each network at the rate of 6.7 percent per year, he arrived at the amount of the expected ABC revenues for the next 8 years, and at the amount of the expected NBC revenues for the next 10 years. He then discounted such future earnings, as to each network, on an annuity basis to arrive at separate values for the network contracts, and then added these two discount values to reach his total appraised amount for both contracts as of 1959.

In allocating the total appraised amount to the two network contracts, he considered such factors as WSOC–TV's opportunity to exert leverage on each of the two networks for better station rates on the basis of competition for the station's time, increased revenues to be derived from having both networks, improved station programming because of choice between competing programs of the two networks on the basis of relative popularity, and the avoidance of local program expense by maximum use of the network programs of both networks to fill the station time.

Taking these factors into consideration, Mr. Gross concluded that the NBC contract, with the programs of that network being the more popular, was worth more in 1959 to WSOC–TV than the ABC contract. He allocated 55 percent of the total value of the television network affiliation contracts to the NBC contract and 45 percent to ABC.

No weight is given to the fair market values of the television network affiliations contracts reached by Mr. Gross in his 1959 appraisal, because of his mistaken assumption as to the lives of such contracts, but careful consideration is given to his 1971 appraisal, in the light of all of the evidence relating to profitability of operations of WSOC–TV.

## IV

In summary, it is concluded that the total cost basis of Carolina in the sum of $6,719,696 for all assets acquired by Carolina upon liquidation of WSOC company as of June 1, 1959, was allocable as of that date to the various assets involved, as follows:

| | |
|---|---:|
| Cash | $ 193,122.00 |
| Accounts receivable | 231,348.00 |
| All other tangible assets | 2,696,964.00 |
| Transmitter site lease | 84,076.00 |
| Film contracts | 209,917.00 |
| NBC television network affiliation contract | 1,288,663.91 |
| ABC television network affiliation contract | 859,109.94 |
| FCC television license | 1,156,495.15 |
| Total cost basis | $6,719,696 |

Since plaintiffs are entitled to additional depreciation and amortization deductions over and above those allowed by the Internal Revenue Service for the taxable years in issue, it is concluded that plaintiffs are entitled to recover, with the amounts of recovery to be determined in further proceedings under Rule 131(c).

## CONCLUSION OF LAW

Upon the findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 131(c).