**The HEARST CORPORATION, Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 326–84T.**

United States Claims Court.

Aug. 27, 1987.

John V. Donnelly, Des Moines, Iowa, for plaintiff.

William K. Drew, with whom were Asst. Atty. Gen. Roger M. Olsen, Mildred L. Seidman, and Michael J. Dennis, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This tax case presents the question of whether plaintiff's predecessor in interest incurred a loss deductible under Internal Revenue Code ("I.R.C.") § 165[1] with respect to the 1980 taxable year as a result of its termination of the affiliation between television station WDTN and the National Broadcasting Company ("NBC"). Whether Hearst is allowed the deduction depends on the exact nature of the asset in question. If the asset owned in 1976 is the affiliation with NBC *per se*, then Hearst is entitled to a deduction. There is no question that if the asset is thus characterized, it was lost in 1980, and the fact that Hearst simultaneously obtained an ABC affiliation would not alter the result. If, on the other hand, the real asset was WDTN's ability to affiliate, as reflected in the existence of any major network affiliation, then Hearst is not entitled to a deduction; if the value of the asset inheres in the ability to affiliate, the asset was not lost. After trial and

---

1. I.R.C. § 165 provides, in relevant part:

   (a) General rule.—There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

   (b) Amount of deduction.—For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

   . . . .

   (f) Capital losses.—Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212.

briefing, the court concludes that Hearst is not entitled to a deduction.

## I. BACKGROUND [2]

*The Parties*

On October 21, 1975, the Trustees of Iowa College and AVCO Broadcasting Corporation ("AVCO") entered into an asset purchase agreement for the sale by AVCO of the assets of television station WLWD in Dayton, Ohio, to the trustees.

On April 6, 1976, Grinnell Communications Corporation ("GCC") was assigned the rights and obligations of the trustees under the agreement. On June 15, 1976, AVCO sold the assets of WLWD to GCC. Including assumed liabilities, GCC paid AVCO $13,071,668.00. The purchase agreement did not allocate the price among the transferred assets. At the time of the closing, WLWD was an NBC affiliated station. The sale to GCC included an assignment of the rights of the television station arising from the agreement dated March 4, 1968, as amended, between AVCO and NBC. Effective June 16, 1976, GCC took control of WLWD, and changed the station's call letters to WDTN. (All subsequent references to the station will use the call letters WDTN.) The Hearst Corporation is the successor by merger to GCC.

*Industry Background*

Television stations operate on channels assigned by the Federal Communications Commission ("FCC"). There are 12 very high frequency ("VHF") channels, numbered 2 through 13, and 70 ultra high frequency ("UHF") channels, numbered 14 through 83. Varying numbers of channels are allocated to particular market areas by the FCC on the basis of population and other factors. Each channel allocated by the FCC may be assigned to a particular applicant by the granting of a construction permit by the FCC and, upon completion of construction and demonstration of compliance with FCC technical requirements, by the granting of a license.

Although a license alone cannot be sold, a license can be transferred upon the purchase of an operating station. Transfer of the license is subject to FCC approval but does not usually require a comparative hearing, unless some issue is raised by a third party. Therefore, a transferee satisfying FCC license requirements can usually count on approval.

Commercial television in the United States is supported primarily by advertising. Because revenues are dependent upon advertising, the value of a television station largely turns on the size and demographic make-up of the licensee's viewing audience. The size of a television station's audience in turn depends on several factors, including its technical facilities, the number of homes with television sets that its broadcasts can reach, the popularity of its programs, the quality of program continuity achieved by the station and its competitors, and the promotional activities of the station, its competitors, and the networks.

Television advertising can be divided into three broad classes known as network, national spot, and local spot. Network revenues consist of the local station's share of the sums charged by the network to advertisers for the use of the individual station's facilities in broadcasting network programs. Spot advertising refers to the direct sale by a local station of either advertising time during non-network programs or, in the case of network programming, of that portion of advertising time that remains available for use by the local station after network advertising has been provided. Local advertisers are those who purchase program time or adjacencies (time reserved to the station between or within network programs) from local stations. The station retains the full proceeds of non-network national, regional, or local advertising (less commissions) as opposed to a percentage of the amount that the network charges its advertisers.

Nationally, there are principally three commercial television networks, American

2. The parties greatly facilitated the court's review by stipulating to virtually all background information. Much of this information is drawn from the lengthy analysis in *Meredith Broadcasting Co. v. United States*, 186 Ct.Cl. 1, 405 F.2d 1214 (1968).

Broadcasting Corporation ("ABC"), Columbia Broadcasting System ("CBS"), and NBC. A fourth network, Allen B. DuMont Laboratories, Inc., ceased operations in September 1955. In the early years of television, CBS and NBC were dominant in the ratings and in the number and quality of their affiliates. ABC and DuMont contended with each other for third place. ABC prevailed over DuMont, but ABC remained a weaker network in terms of audience ratings most of the time until after 1975.

Television programming has always been expensive to produce. Because of high costs, television can be an economical and effective advertising medium only if it attracts a large viewing audience. The networks have always been the major source of programming capable of attracting large audiences. Networks dominate programming because they are able to spend more on a given program than a typical station. They can cover the cost because of the larger number of affiliates that will broadcast the show. Traditionally, network programs have been most significant during the prime time evening hours when potential audiences are the largest. Advertisers are especially interested in prime time, and advertising rates are then highest.

In the case of network revenues, the network is paid directly by the advertiser or advertising agency. The network, in turn, maintains an agreement with each affiliate as to that affiliate's compensation rate. These rates are negotiable depending upon the relative bargaining power of each affiliate and the network involved. This compensation rate establishes the basis of what a network will pay its affiliate. It is rare that a network compensates an affiliate for all of the time carried. The network pays for the program, distribution costs, and the cost of selling the program. The actual station compensation, therefore, is relatively small compared to what the station can receive from airing local or national spots adjacent to the program. Network affiliates generally have higher revenues and higher profit margins than do independent stations. Affiliates also benefit from network promotional advertising.

In television markets where the number of commercial stations is the same as or greater than the number of networks, each network usually enters into an affiliation relationship with one station in the market, giving that station the right of first refusal on programs that the network provides. Any programs that are not taken by the affiliate can be taken by other stations in the marketplace. During the years relevant to this proceeding, TV stations and networks typically maintained affiliation relationships for two-year terms. These relationships were typically renewed unless terminated by either party. Termination required advance notice of at least a specified number of days (often 180 days).

Although networks negotiate different arrangements with different affiliates, particularly compensation rates, each network has a standard affiliation arrangement that forms the basis for the essential terms of each individual affiliation agreement. Although specific provisions of standard affiliation arrangements vary from network to network, industry practice has established common features for all network affiliation arrangements. The standard arrangement usually states that the network agrees to: (1) provide, at its expense, programming to the station; (2) offer the station the first opportunity to broadcast network programs in the station's market area; and (3) pay the station a specified amount for broadcasting the network programs or a percentage of the station's compensation rate, based upon the number of hours carried, commercials, and clearance of the program by the affiliate. The network affiliation arrangements relevant here contain all of the above-stated features.

Television stations seek to affiliate with a network, if possible, because of the substantial financial benefits usually derived from network affiliation. Networks enter into affiliation agreements without charge to the local stations because the networks realize substantial benefits by securing access to the local television markets through the affiliates.

In television markets where there are fewer stations than the number of commercial networks, the networks compete actively for affiliates. This is, however, a very uncommon situation. Where there are more stations in a market than networks, the stations compete for network affiliations. It is rare that all stations have equal bargaining power in the marketplace. Where the market is balanced with an equal number of stations and networks, the rivalry is a matter of which station will combine with which network, but almost invariably all stations and networks will become affiliated.

In 1976, as a result of improved audience shares, ABC began conducting a campaign to acquire more and better local television station affiliates. After trailing NBC and CBS in ratings for many years, ABC improved its ratings on a national basis very significantly after 1975, and, beginning in 1976, used its improved ratings to convince NBC and CBS affiliates to change affiliation to ABC.

Prior to a nationwide freeze on processing new applications,[3] the FCC allocated two commercial VHF channels to the Dayton market: Channels 2 and 7. Commercial television broadcasting in the Dayton, Ohio market began with the start-up of WHIO (Channel 7) in January 1949. WDTN (Channel 2) went on the air in March 1949. After the freeze, the FCC assigned three commercial UHF channels to the Dayton market: channels 22, 26, and 45. Station WKEF went on the air in September 1964, on channel 22.

*Network Affiliations in the Dayton Market*

NBC had a primary affiliation with WDTN between 1949 and January 1, 1980. UHF station WKEF had a secondary affiliation with NBC during part of this period—from 1965 until 1969. For a brief period in 1968, WHIO also had a secondary affiliation with NBC.

CBS entered the Dayton market in 1949 by acquiring a primary affiliation with WHIO when that station began operations. WHIO has continued to be CBS's primary Dayton affiliate since that time. WKEF also had a secondary affiliation with CBS from 1967 until 1969.

ABC entered the Dayton market by acquiring WDTN as a secondary affiliate in 1954. That secondary affiliation lasted until 1968. In about 1969, WKTR–TV, a UHF station, became affiliated with ABC. Following the filing of an antitrust suit by WKEF, ABC changed its affiliation to WKEF. WKTR–TV subsequently went out of business. WKEF remained affiliated with ABC until January 1, 1980, when ABC switched to WDTN.

During 1975 and 1976 there were no applications pending before the FCC requesting the issuance of either construction permits or licenses with respect to channels 26 and 45 in the Dayton market. From 1970 until at least January 1, 1980, the three commercial television stations located in the Dayton market that were affiliated with networks were affiliated solely with the following networks:

| STATION | NETWORK AFFILIATION |
|---------|---------------------|
| WHIO–TV | CBS |
| WKEF–TV | ABC |
| WDTN | NBC |

From the mid to late 1970s, ABC (station WKEF) moved from being the number three to the number one or two network in the Dayton market (dependent upon time period and market measure used). On June 18, 1979, station WDTN announced that it would become affiliated with ABC. On that same day, GCC notified NBC of its intention to terminate its affiliation with NBC effective at 3:00 a.m. New York City time on January 1, 1980. WDTN's affiliation agreement with NBC provided for an automatic renewal unless either party gave notice of intent not to renew at least 180 days before the expiration date. On January 1, 1980, WDTN's affiliation with NBC terminated.

NBC's final affiliation agreement with WDTN provided that, among other things,

---

**3.** On September 30, 1948, the FCC stopped processing applications for new television station construction permits and did not resume processing such applications until July 1, 1952. This period is referred to in the industry as "the freeze."

WDTN had a right of first refusal to broadcast all NBC network programs offered for broadcast in the Dayton area. The right of first refusal was good for 72 hours.

WDTN's full network station rate was $2,100 per hour. The full rate applied between 6:00 and 11:00 p.m. Monday through Sunday. Lower rates applied during other specified hours of the broadcast day. NBC paid WDTN 33⅓ percent of the applicable network station rate for broadcasting sponsored network programming.

ABC's affiliation agreement with WDTN, dated July 2, 1979, provides, among other things, that

WDTN has first call on all ABC network programming offered for broadcast in the Dayton area. WDTN has 15 days to accept or reject scheduled network programming and 72 hours (exclusive of Saturdays, Sundays, and holidays) to accept or reject non-scheduled network programming.

WDTN's network station rate is $2,554. ABC pays WDTN 32 percent of the network station rate for sponsored network programming broadcast between 6:00 and 11:00 p.m. Monday through Sunday and lower percentages for broadcasts at other specified times during the broadcast day.

The agreement has a 2–year term and is to be automatically renewed for two more years at the end of each term unless either party gives notice of termination at least 6 months before the end of the current term.

*The Present Claim*

For both book and income tax purposes, GCC asserted the initial fair market values of the assets that it acquired from AVCO to be as follows:

| | | |
|---|---:|---:|
| Land | | $ 316,000 |
| Buildings | | 761,630 |
| Equipment | | |
| Spare tube inventory | $ 25,000 | |
| Machinery and equipment | 2,486,866 | |
| Furniture and fixtures | 133,452 | |
| | | 2,645,318 |
| News Film Library | | 80,000 |
| Video Tapes | | 65,000 |
| NBC Affiliation | | 3,600,000 |
| Cincinnati Reds Contract | | 1,200,000 |
| Film Inventory | | 681,222 |
| Software | | 25,000 |
| FCC License and other intangibles | | 3,697,498 |
| Total | | $13,071,668 |

These values were based on appraisals performed for GCC by Tait Appraisal Co. ("Tait") in 1976. The parties have agreed for the purposes of this case that the respective fair market values assigned by GCC to land, buildings, equipment, news film library, video tapes, Cincinnati Reds contract, film inventory and software were correct. The parties' dispute relates to the characterization and amount of the "NBC affiliation—$3,600,000."

On July 24, 1981, GCC filed timely claims for refund for the tax years 1976 through 1980.[4] These claims demanded refunds based on the contention that, because of the termination of its affiliation with NBC, GCC was entitled to deduct on its 1980 income tax return the $3,600,000.00 attributed to the NBC affiliation as part of the total purchase price paid to AVCO for the assets of WDTN in 1976. The claimed deduction would entirely offset GCC's previously reported taxable income for 1980 and create a net operating loss that could be carried back to GCC's tax years of 1976 through 1979.

On September 9, 1981, all of the outstanding shares of stock of GCC, which had no significant assets other than station WDTN, were acquired by Hearst[5] for a base purchase price of $39,145,036.00. On August 24, 1983, the Internal Revenue Service disallowed the claimed refunds and Hearst timely filed its complaint here on June 25, 1984.

---

4. GCC filed timely federal corporation income tax returns for calendar years 1976 through 1980, in which it did not claim for income tax purposes any deduction for depreciation or amortization with respect to its affiliation with NBC.

5. The actual acquisition involved two mergers which do not have any direct bearing on the litigation.

### The Expert Testimony

At trial, the parties presented three expert witnesses. A summary of their testimony is presented here. It is considered in more detail in the discussion of its importance under the case law.

Hearst's two experts, William Robinson and James Bond, have conducted numerous appraisals of the assets of television stations. Robinson was working with Tait at the time it conducted the 1976 appraisal in connection with GCC's acquisition of WDTN. Both experts presented appraisals of the assets of WDTN as of 1976. Robinson and Bond testified that in practice, the buyer and the seller of existing commercial television stations regard a network affiliation as a saleable commodity of significant value, regardless of the number of stations authorized to operate or actually operating in the market and regardless of the mix of VHF and UHF stations. In other appraisals unrelated to WDTN, both placed a value on network affiliations, assuming they existed, separate from the other intangible assets of the station in question.

The 1976 appraisal, in which Robinson participated, utilized financial data covering the years 1969 through 1976. The weighted average annual gross receipts from NBC were $994,976.00. Robinson concluded that the NBC affiliation could be expected to continue for at least twenty years more, and assuming a nine percent rate of return, the rounded present value of the weighted annual cash flow (approximately $390,000.00) from NBC for twenty years would be $3,600,000.00. Robinson used this same methodology in determining the value of particular network affiliations of other television stations. This is the amount Robinson testified to be the minimum value of WDTN's affiliation with the NBC television network when it was acquired by GCC from AVCO in June 1976.

Bond utilized two approaches to valuation. The one he most fully developed was, like Robinson's, based upon income capitalization. He concluded that as of June 15, 1976, the NBC affiliation had a minimum value to WDTN of $4.2 million. Bond felt the true value could be higher because the income capitalization method does not fully measure "fringe benefits" of being affiliated with a network, such as free programming, adjacencies, and premium audience attributes. Based on a "comparables" approach, using figures reflected in five reported court decisions, he also came up with a larger value of $6,000,000.00.

Defendant's witness was Dr. Rolland Johnson. He is president of a company that owns several radio stations. Because of his experience and education in communications, he has frequently appraised radio stations. He did not, however, do an appraisal of WDTN. Instead, he prepared a report directed at the methodology and theory behind the Bond and Robinson appraisals.

It was Johnson's testimony that WDTN did in fact have a valuable asset in 1976. The real difference between his view and that of Robinson and Bond, however, is in defining that asset. It was his opinion that it is only in unusual circumstances, not present here, that the "thing" that creates a valuable asset for the station is an affiliation with a specific network. Johnson takes the position that in most circumstances, the asset in which the value inheres is not the affiliation with a *particular* network, but the ability, due to the local market and the station's characteristics, to affiliate in general. He testified that the ability to affiliate and an affiliation do not exist, as a practical matter, apart from each other in the marketplace. If a station is positioned to be affiliated, then it will have an affiliation. Moreover, it was Johnson's view that WDTN did not derive any benefit from affiliation with NBC that it could not have obtained from affiliation with ABC or CBS in 1976. Because WDTN never lost the real asset in question—the ability to affiliate—it did not, according to Johnson, suffer a loss in 1980. It is important to note that Bond and Robinson did not really challenge this analysis. Their charter was to fix the value of the NBC affiliation. Their reports and testimony were based on the assumption that there was an asset that was lost in 1980.

With respect to the value of the asset, however characterized, Johnson made a brief effort to question the precise application by Bond of the income capitalization method of valuation, but never challenged its general utility here. He did more seriously question Bond's use of a comparables approach. In each of the cases Bond relied upon, the station in question went permanently to a lower number of affiliations because of a change in the market. In one case, the station went from four networks to none. Because in the case at bar WDTN had only one affiliation, and at all times retained the ability to keep one affiliation, Johnson found the comparables approach inappropriate.[6]

The experts thus agree that WDTN had a valuable asset in 1976, but disagree as to whether there was a loss because of their different characterizations of the asset in question. The experts' disagreement highlights the importance, under the case law, of precisely describing that asset.

## II.  DISCUSSION

In making its determination, the court is guided by the admonition in the relevant regulations that "[o]nly a bona fide loss is allowable.  Substance and not mere form shall govern in determining a deductible loss."  26 C.F.R. § 1.165-1(6) (1986).  Defendant points to Mertens' characterization of this requirement as the taxpayer's burden to prove "a real change of position in a true economic sense."  7 J. Mertens, Law of Federal Income Taxation § 28.05 (1980). A close examination of the circumstances, the expert testimony, and related case law leads to the conclusion that Hearst has not proven that it sustained a loss.

There is no precedent precisely on point. The court begins its analysis, however, with an examination of four cases that the parties agree are relevant authority. *Meredith Broadcasting Co. v. United States*, 186 Ct.Cl. 1, 405 F.2d 1214 (1968), dealt with a television station that was affiliated with all four of the then-major television networks (ABC, CBS, NBC and DuMont). When KPHO was acquired by Meredith in 1952, it was the only commercial television station operating in the Phoenix, Arizona area.  The court found that Meredith could have acquired all four affiliations from the respective networks if the station had not already had them.  *Id.* at 14, 405 F.2d at 1221.  Meredith placed no significant value on its monopoly position, however, because the temporary freeze on issuance of new licenses by the FCC would end soon, and management knew that KPHO was likely to lose at least three of its four affiliations in the near future.  It was expected, however, to retain affiliation with at least one of the networks.  Contrary to expectations, in the following years the station lost all its network affiliations.

The question presented to the Court of Claims was whether any part of the purchase price attributable to intangible assets was properly allocable as the cost basis in the network contracts.  "Against this background," the court found that the network affiliations were distinct intangible assets of significant identifiable value, and that they were not merely goodwill.  The court found that network-affiliated stations have higher revenues, lower costs, and higher operating profits than independent stations.  It was the loss of those advantages that, according to the court, gave rise to a recognizable loss for Meredith.  In discounting somewhat plaintiff's valuation of that loss, the court stated, "What the value alleged by plaintiff inheres in is a mere possibility of extension [of the CBS contract]."  *Id.* at 23, 405 F.2d at 1227.

What occurred in *Meredith*, therefore, is that the station lost all of its affiliations in a market with four commercially licensed stations competing for three[7] networks. Because those affiliations unquestionably had value, and because they were all lost, Meredith was allowed to deduct its cost

6. The court's conclusions, *supra,* lead to the same result.  The court has no reason, however, not to accept the income capitalization method proposed by Robinson and Bond.

7. The fourth network, DuMont, went out of existence contemporaneously with the termination by the other three networks of affiliations with Meredith.

basis attributable to those affiliations under I.R.C. § 165.

In *Roy H. Park Broadcasting, Inc. v. Commissioner,* 56 T.C. 784 (1971), the taxpayer had acquired television station WNCT in Greenville, North Carolina, in 1962. At that time, the FCC had allocated three VHF channels and one UHF channel to the Greenville market. WNCT was a VHF station affiliated primarily with CBS and secondarily with ABC. NBC was affiliated with another VHF station, WITN. The third VHF station, WNBE, went on the air in September 1963, at which time WNCT lost its ABC affiliation to WNBE. Park claimed that the termination of the ABC affiliation of WNCT in 1963 gave rise to a deductible loss. The Tax Court agreed. As in *Meredith,* the court rejected defendant's argument that the affiliations had no value. They were plainly saleable commodities having a direct impact on the station's revenues. With respect to the loss of the ABC affiliation, the court pointed to the value inherent in any secondary affiliation:

> First, it permits the station to choose among a larger selection of programs so as to attract the largest possible audience.... It also permits a station to schedule its strongest programs for early hours of the evening in order to attract viewers during those critical times in the hope that their televisions remained tuned to such station.... Second, it improves a station's bargaining position with respect to the network rates since several networks are then competing for the affiliate's time. Lastly, the network, desirous of having its programs broadcast, frequently allows the showing of its programs in nonprime hours while compensating the station at prime rates.... Thus, despite the existence of a primary affiliation ... a secondary affiliation is of definite value to the station.

*Id.* at 794–95. The value of the ABC secondary affiliation was reflected in the network's contribution to earnings. Although only thirteen percent of WNCT's network broadcasts originated with ABC, they were responsible for thirty-two percent of the station's income.

In *Miami Valley Broadcasting Corp. v. United States,* 204 Ct.Cl. 582, 499 F.2d 677 (1974), the FCC had allocated two VHF and two UHF channels to Charlotte, North Carolina. In 1959, the taxpayer purchased WSOC, one of the two VHF television stations. At that time, WSOC had dual primary affiliations with NBC and ABC. One of the UHF channels (WCCB) went on the air in 1964. In 1967, WSOC terminated its affiliation with ABC, and WCCB became affiliated with ABC.

The legal issue in *Miami Valley* was somewhat different than the instant case. There the court was asked only to determine the cost basis Miami Valley had in WSOC'S affiliations for amortization purposes. It was thus required to determine their useful life. The court adopted the trial judge's findings that the fact of dual affiliation was extremely valuable to WSOC. If it had a single affiliation with NBC during the period in question, its revenues would have been over three and a half million dollars less. Dual affiliation resulted in reduced costs, yet expanded the available programs. The court also found that it was reasonably predictable in 1959 that within ten years a third station would come into the market and take the weaker of the two network affiliations, ABC, from WSOC; however, WSOC could count on keeping the stronger network affiliation with NBC because it was a VHF station. The NBC contract could have been expected to continue indefinitely and thus its value would not be reduced within a reasonably ascertainable period of time. The court thus concluded that although both the NBC and ABC affiliations were valuable assets in 1959, only the amount attributable to the ABC affiliation could be amortized.

Hearst places its primary reliance on the Court of Claims' decision in *Forward Communications Corp. v. United States,* 221 Ct.Cl. 582, 608 F.2d 485 (1979). In 1965, Forward acquired television station KVTV in Sioux City, Iowa. At that time only two television stations were operating in the Sioux City area. KVTV was thus able to have affiliations with two networks. It

had joint affiliations with CBS and with ABC. In 1965 Forward had reason to anticipate that a third television station would begin operating in its market area in the near future. This, it knew, would cause a realignment of network affiliations, with each of the three stations in the area being affiliated with one of the three networks. Realizing that it would not be able to maintain both of its affiliations, Forward began a study to determine which affiliation should be retained. It concluded that an exclusive affiliation with ABC would be most advantageous. After Forward obtained an exclusive ABC affiliation, it terminated the CBS affiliation. Despite the loss of the CBS affiliation, Forward's revenues increased. The taxpayer subsequently claimed a deduction under I.R.C. § 165 for the value of the CBS affiliation. The trial judge found, however, that no loss was incurred because the increase in the taxpayer's network revenues showed that the loss had been "compensated."

On appeal, the Court of Claims reversed. It held that the loss deduction under I.R.C. § 165 was allowable. It began its analysis by pointing out that the dual affiliation KVTV had with CBS and ABC when the plaintiff acquired the station in 1965 was more valuable than a single affiliation would have been, because it provided the station with additional benefits. *Id.* at 610, 608 F.2d at 500. Emphasizing the similarity of Forward's circumstances to those in *Meredith*, *Park*, and *Miami Valley*, the court concluded that

> [a]fter the CBS affiliation was terminated in 1967, the plaintiff no longer had these benefits. It therefore suffered a loss in that year reflecting the additional value of the second affiliation. This court and the Tax Court have recognized that a TV station that has affiliations with more than one network incurs a loss when any of its affiliations is terminated.

*Id.*

The court rejected the argument that the loss deduction was not allowable because it was compensated for by its improved position with a single ABC affiliation:

> The statute does not bar a deduction for a loss actually incurred merely because the taxpayer is able to effect an offsetting gain on a different although contemporaneous transaction. In the present case, plaintiff suffered a loss upon the termination of the CBS affiliation, measured by the value of that affiliation. That loss was not "compensated" under section 165(a) by the fact that plaintiff's new exclusive affiliation with ABC was more profitable than its prior joint affiliation with either [ABC] or CBS.

*Id.* at 611–12, 608 F.2d at 501.

The court also rejected the trial court's holding that *Forward* had effected an exchange under I.R.C. § 1031(a) through the simultaneous transactions with CBS and ABC:

> Although it was the new exclusive ABC affiliation that led the plaintiff to terminate its CBS relationship, that causal effect did not convert plaintiff's separate transactions with ABC and CBS into an "exchange" of the CBS affiliation for the ABC exclusive affiliation for which section 1031(a) bars recognition of loss.

*Id.* at 613, 608 F.2d at 502.

In light of *Forward*, defendant here cannot rely on evidence of the effect of the switch on the station's economic well-being or on the fact that the transaction involved simultaneous disaffiliation and affiliation. For this reason, exhibits offered for that purpose are of no probative value. The only circumstances considered by the court that postdate the acquisition in 1976 of the station by Hearst's predecessor are those related to filing the claim, and the voluntary disaffiliation with NBC. The simultaneous affiliation with ABC is not relevant except insofar as it constitutes circumstantial support for the defendant's assertion that the real asset involved—the ability to affiliate—still existed in 1980. Specifically, the court has not considered the economic impact of the switch to ABC.

Initially it can be observed that the facts of these four decisions are different from the case at bar in that each involved a permanent loss of one or more affiliations.

In *Meredith*, KPHO went from a monopoly of all four networks to having none. In *Park*, WNCT had two affiliations and ended up with one. The same is true of the stations in *Miami Valley* and *Forward*. In each of these cases, the loss of affiliation (whether primary or secondary) reflected a simultaneous change in the market that resulted in the loss of the ability to affiliate. In the present case, however, WDTN had one affiliation in 1976, and based on market circumstances, will, for the foreseeable future, maintain the ability to keep one affiliation.

The overriding principle that clearly emerges from these cases is that "... the determination must be made largely on the facts and circumstances peculiar to each case." *Miami Valley*, 204 Ct.Cl. at 600–01, 499 F.2d at 687.[8] For Hearst to recover, therefore, it must demonstrate that it incurred a loss despite a market configuration different from market configurations present in the earlier cases.

The background facts have been set out in detail. Those critical to resolution can be easily summarized. WDTN is a VHF station. The Dayton market is only authorized two VHF stations. VHF stations are inherently more attractive to networks because of their wider coverage.[9] Low dial settings such as WDTN's (channel 2) are particularly desirable. The Dayton market in 1976 was a balanced market. That is, three stations competed for three networks, and vice versa. It has remained a balanced market and for the foreseeable future will continue to be a balanced market.[10] The benefits to a station of network affiliation are undisputed. Stations naturally, then, value the ability to affiliate.

■ Under these circumstances, the question becomes: Was the value reflected on the 1976 asset statement with respect to the network affiliation dependent on the fact that the affiliation was with NBC? For the reasons that follow, the court concludes that it was not.

The parties have stipulated that where the market is balanced in this fashion, almost invariably all stations and networks will become affiliated. The court finds, based on Dr. Johnson's testimony, on the fact that WDTN had a low dial position, and on the lack of any independent reason that would keep WDTN from affiliating, that WDTN would in fact have been affiliated with another major network in 1976 if it were not affiliated with NBC, and that for the foreseeable future it would continue to be affiliated. These same circumstances and characteristics existed in 1980. WDTN did not lose its ability to affiliate.

This market dynamic in which stations in balanced markets are assured of affiliation is also discussed in *Miami Valley* and *Park*. In the former case, the Court of Claims points out that, "in any market where the number of television stations is

---

8. Hearst cites Revenue Procedure 75–39, 1975–2 C.B. 569, apparently to show that the IRS read *Meredith*, *Park*, and *Miami Valley* in a way consistent with Hearst's position. That procedure states that in allocating the lump sum purchase price of a television station:

> The value of a TV network affiliation contract may be calculated separately since affiliated TV stations have higher revenues, lower costs, and higher operating profits than otherwise comparable independents due to greater audience, revenue from spot advertising adjacencies, no cost for network shows, and the receipt from the network of a fractional part of advertising rates.

*Id.* at 571. Hearst points out that the procedure is not limited to valuation of VHF affiliations in markets having three or more VHF stations. Plaintiff's analysis misconstrues defendant's argument, however. As discussed *supra*, defendant's position is not that affiliations only have value in those limited circumstances. Its position, with which the court agrees, is that the affiliations have value, but the character of the asset is such that it is only *lost* under peculiar circumstances such as those found in *Meredith* or *Park*, or those enumerated by Dr. Johnson.

9. Johnson reports that despite efforts by the FCC and UHF stations to minimize the disparity caused by the shorter range of the UHF signal, a UHF affiliate is worth only one-tenth to one-third as much to the network as a VHF affiliate.

10. This conclusion is supported by the stipulations and the expert's reports. In his testimony, however, Johnson alludes to the existence of a fourth station presently in the market. Tr. at 121. It is a UHF station, however, and thus the equation as to WDTN and WHIO, both VHF stations, would not change. They would be assured of continued affiliation.

the same or greater than the number of networks, and where there are at least three competitive stations, *each of the three networks enters into an exclusive affiliation contract with one television station....*" 204 Ct.Cl. at 595, 499 F.2d at 684 (emphasis added). Based on the fact that WSOC was assured of keeping one affiliation, it was not allowed to amortize its affiliation with NBC as a wasting asset. This conclusion is analogous support here for defendant's position that, because WDTN was assured indefinitely of keeping an affiliation, the real value lay not in the connection to NBC, but in the ability to indefinitely maintain a network affiliation. If Hearst suffers a loss, it will be when two circumstances occur: first, when WDTN is no longer able to maintain a network affiliation; and second, when that vulnerability leads to actual disaffiliation.

Analogous support is also found in *Park.* The court's analysis with respect to the dynamics of the "pairing up" of stations and networks is similar to that of the witnesses in this action:

> The reason affiliation is so generously conferred upon stations is that the network is as eager as the station to enter into affiliation so as to secure an outlet in the market. Indeed, where there are more networks than stations in a market, networks will compete with one another for affiliations. In the reverse situation, however, it is the local stations which vie for affiliation. *In balanced markets, where an equal number of networks and stations are present, the rivalry described above is reduced to the question of which station will combine with which network; almost invariably, all stations and networks ultimately become affiliated however.*
>
> ....
>
> [T]hree station markets are known as "stable" markets. While changes in affiliations may occur *in stable markets the frequency of such changes is considerably less than in unstable markets. Moreover, the loss of a primary affiliation by one of the component stations of a three-station market will ordinarily be offset by acquisition of another* since, under normal conditions, each such station is paired off with one network.

56 T.C. at 793, 800 (emphasis added).

Contrary to plaintiff's assertion in its post-trial brief, defendant does not take the position that WDTN did not have an asset in 1976 reflected in the affiliation with NBC. All three experts testified that affiliations in general have value. Johnson stated that he would have expected, upon looking at AVCO's balance sheet in 1976, to see a value assigned to the network affiliation. From Johnson's viewpoint, in any situation in which there is an affiliation or the ability to affiliate, there is an asset with value that can be bought and sold along with the station. Whether it can be depreciated, however, or whether it can be subsequently lost, depends, according to Johnson, on the particular circumstances.

For example, any multiple affiliation is inherently more valuable than a single affiliation. Where a station moves to any lesser number of network affiliations, that asset is diminished. This is the clear holding of *Meredith, Park, Miami Valley,* and *Forward.* This is also completely consistent with Johnson's position. The asset being lost, for example, when a two-affiliation station loses one network is the advantage inherent in the dual affiliation status. As Johnson testified, if a dual station becomes a single affiliation station, it has lost an asset because,

> with a secondary affiliation, the station has the ability to choose the best programs from each network.... [O]bviously it should be able to achieve a higher audience than would be the case if it affiliated with either one of those networks.
>
> ... [T]he affiliate who has ... two or three networks to play off against each other, can get higher compensation rates from the network, and can get special kinds of considerations.
>
> So they can cherry pick programs. They can get higher rates in terms of compensation, and that is of value to the station.

Tr. at 157–58.

Any multiple affiliation status therefore would be reflected in the station's balance

sheet. If the number of affiliations is reduced, that part of the value attributable to the leverage created by the lost affiliation is deductible. In assessing the impact of that loss, it is appropriate to look to the amount of net income generated by the secondary affiliate. *See Park,* 56 T.C. at 795.

The same would be true, as Johnson points out, when four stations, one of which is a UHF station, are competing for three networks. If by chance the UHF station had an affiliation, and if one of the VHF stations was not yet operational, the UHF affiliation would be depreciable because it would in all likelihood be lost when the VHF channel came on the air. Networks prefer to affiliate themselves with VHF stations because they have greater transmitting power than UHF stations. When the UHF station loses its affiliation, it would experience a loss.

The circumstances in this case do not present an unstable market situation, however. WDTN's disaffiliation was not precipitated by loss of its ability to affiliate. In such circumstances, Johnson contends, and the court agrees, WDTN should not be able to treat the disaffiliation as a loss. The station did not, in any meaningful sense, have an asset that could be lost short of closing the station or entrance into the market of a new VHF station.

In light of the stipulations and of the facts as found by the court, the test of Hearst's argument is simple. Assume simply a disaffiliation with NBC and no contemporaneous reaffiliation with another network, under market circumstances present here. Assume further that Hearst sold WDTN at a point when it was disaffiliated with NBC, but not yet reaffiliated. The logical inquiry becomes: Would an appraisal of WDTN reflect no value, however denominated, for its ability to obtain an affiliation with a major network? In view of Johnson's uncontradicted testimony, the answer has to be that there is still a valuable asset present, despite the disaffiliation. It is inconceivable to the court that under those circumstances WDTN would not seek compensation for the continuing assurance of affiliation, at an amount equivalent to the value assigned to the NBC affiliation.

While the precise value of that asset might not perfectly overlap with an existing affiliation in 1976 with NBC, Hearst had the opportunity to argue that some part of the 1976 appraisal inhered in the particular connection to NBC. *Cf. Commissioner v. Indiana Broadcasting Corp.,* 350 F.2d 580, 584 (7th Cir.1965). It chose not to take that alternative approach.[11] Hearst has not argued and indeed the record would not permit a finding that WDTN derived any benefit from affiliation with NBC that it could not have derived from affiliation with one of the other major networks. One of Hearst's experts concurred in that judgment. The following colloquy makes that plain:

Q [Y]ou identify four general types of benefits derived from a television station from a network affiliation, isn't that correct, as numbered on that page as 1, 2, 3, and 4?

A Yes, it is.

Q Those benefits, those general types of benefits, can be obtained by a television by affiliating with any of the three major commercial television networks, is that not correct?

A Yes.

Tr. at 89.

This sounds remarkably like Johnson's testimony that "each of the networks are principally offering the same kinds of services to their affiliates." Tr. at 117. In their valuations, Robinson and Bond did not draw any distinction between the affiliation with NBC and the ability in general to affiliate. They did not attempt to measure

---

11. Plaintiff has not attempted to show as an alternative that it lost the incremental difference in value between an NBC affiliation in 1976 and perhaps a less valuable affiliation with another network at that time. Hearst's witnesses did not make any such distinctions. Such a loss would obviously be substantially less than the generic value of the ability to affiliate in that market. Hearst simply argues that it is entitled to a loss deduction for the entire value shown on the 1976 asset statement.

the added incremental value to the affiliation of its "NBC" character. Nor did they take into account the configuration of the Dayton market.

Hearst's only effort to directly rebut through its experts the substance of Johnson's analysis came in two questions to Bond:

Q On Page 12 of Dr. Johnson's report, he purports to identify a "Significant intangible asset," which he refers to as, "The ability of the station to acquire and maintain a major network affiliation."

Is this an asset which is recognized in the profession of valuing the assets of television stations?

A No.

Q Is it an asset recognized in the broadcast industry?

A Not in my experience, no.

Tr. at 167.

Hearst in its post-trial brief argues vehemently that this lack of pedigree to the name chosen by Johnson is fatal to defendant's case. The court is less concerned, however, with what the asset is called than with what it is. In that respect Johnson's analysis is not meaningfully contested by plaintiff's experts. As mentioned before, the court will look to "[s]ubstance and not mere form" in deciding the nature of the asset in issue. 26 C.F.R. § 1.165–1(6) (1986). Plaintiff fails to demonstrate that in the present circumstances, WDTN's actual affiliation represents an asset different from its ability to affiliate.

In its post-trial brief, Hearst makes the argument that under defendant's theory, only a handful of the 517 commercial VHF stations in operation in the United States in 1976 would be able to treat their network affiliations as an asset. There were only twelve markets at that time in which there were more than three VHF operating stations. This point is based on the incorrect premise that Johnson contended that affiliated stations in markets with three or fewer VHF stations could not treat their affiliations as an asset. Johnson's position is not that the affiliation has no value, but that in a stable, three-station-or-fewer market, the *ability* of a VHF station to affiliate is indistinguishable from the affiliation itself. Because the ability to affiliate is not lost barring a change in the market, the asset continues indefinitely and should thus not be amortized and a change in affiliation should not occasion a loss. The following dialogue between counsel for Hearst and Johnson makes clear that Hearst's argument is incorrectly premised:

Q And now let's talk about a market that has exactly three VHF stations, and again, we'll assume parity among them. And any number of U's that you care to talk about, I assume again that based on your experience that none of the three VHF stations should be allowed to place a value on their network affiliation?

A They could place a value on it. The likelihood of their losing that affiliation, in my opinion, is fairly remote.

Q But under your theory, you would say that would not be proper, they should have the same asset WDTN has, the ability to get and maintain a network affiliation?

A Yes.

. . . .

Q But if you were doing the appraisal, you would say that the proper name of that asset is the ability to get and maintain a network affiliation?

A That's correct.

. . . .

Q [H]ypothesize another market that has three comparable U's and no V's and no allocation of V's. Again, would any of these stations, in your theory, be entitled to allocate part of their purchase price to the network affiliation?

A Again, I believe they could place value on it. But I believe that value would last imperpetuity [sic].

. . . .

Q But it would not be appropriate to assign a value to the affiliation as such?

A No, I didn't say that.

Q I'm sorry then I misunderstood you.

A I've maintained that it's appropriate to assign a value to it, but the fact is that that value—that there is value that should continue on because in a three UHF market, that—as the fortunes of the networks change, one of those U's is likely to be stronger than one of the other U's. And they can change from network affiliate to network affiliate.

They have not lost anything. They have not changed from being a network affiliate to being an independent station. That, in my opinion, is a loss of significance.

Tr. at 144, 145, 146, 148.

The court adopts Dr. Johnson's analysis because it recognizes the station and market circumstances that, under precedent, have to be taken into account. Robinson and Bond made no effort to do so. They simply began by assuming there was a loss. Their only inquiry was as to value. Their studies did not deal with the question of whether the fact that the affiliation was with NBC in particular added in any way to the value of the affiliation.

Hearst's reliance on *Joffre v. United States,* 331 F.Supp. 1177 (N.D.Ga.1971), is misplaced. There the taxpayer purchased a liquor store in Atlanta in the 1940's. He allocated $30,000.00 of the $40,000.00 purchase price to "goodwill." The number of retail liquor stores was limited by local ordinance and it was virtually impossible to open a new one. Also, advertising and price competition were forbidden. Business at the store declined over the years. In 1964 the taxpayer closed the store and opened a new one 2.6 miles away. Jaffee's claim in 1964 of a deduction for the loss of the amount allocated for goodwill was denied by the Commissioner, primarily on the theories that in a monopolistic situation, goodwill could not exist, and that if it did, it was transferred to the new store. The court rejected both arguments. It first held that the anticipation of a monopoly could indeed be part of the "goodwill" purchases. Next it found that the goodwill attached only to the original location. Nei-

ther the analysis nor holdings of *Joffre* aid Hearst in any way.

## III. CONCLUSION

Any number of occurrences have either been recognized in the cases or can be hypothesized in which loss of a primary or secondary affiliation would be deductible under I.R.C. § 165. The facts here do not warrant such a conclusion, however. In the final analysis, Hearst has failed to prove that in any meaningful sense it lost anything in 1980 that it possessed in 1976. It had a VHF license and a low dial position and, because of the unique Dayton market characteristics, was assured of having a network affiliation. None of that was lost.

Judgment is entered for defendant. The Clerk is directed to dismiss the complaint with each side to bear its own costs.