**ALLEN H. DAHME ASSOCIATES, INC.**

**v.**

**The UNITED STATES.**

**No. 306–65.**

United States Court of Claims.
Jan. 22, 1971.

Platt W. Dockery, Grand Rapids, Mich., attorney of record, for plaintiff. Warner, Norcross & Judd, Grand Rapids, Mich., of counsel.

Kenneth R. Boiarsky, Washington, D. C., with whom was Asst. Atty. Gen.

Johnnie M. Walters, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

COLLINS, Judge.*

In this income tax refund case we are forced to deal with the concept of goodwill—one of the most troublesome in the law of taxation. The plaintiff taxpayer is suing to recover income tax paid (plus interest) by virtue of the disallowance by the Commissioner of Internal Revenue of amounts sought to be deducted under section 163 of the code [1] as interest paid or accrued on indebtedness during the taxable years 1961–63. The Commissioner disallowed the amounts because, in his opinion, no consideration was given for the debenture bonds upon which the interest was paid. In issue is the question of whether plaintiff has sustained its burden of proving that it received, in exchange for the bonds in question, valuable consideration, in the form of goodwill, sufficient to support the disallowed deductions.

Briefly, the facts are as follows. For some 27 years, Allen H. Dahme was employed by Grand Rapids Store Equipment Company (hereinafter Grand Rapids). Grand Rapids engaged principally in the manufacture of various types of display cases and fixtures for retail stores. In addition, it maintained a store planning and design service. Mr. Dahme served the company in various capacities, starting as a draftsman and retiring as vice president and general sales manager.

In 1949, while employed by Grand Rapids, Mr. Dahme was given the opportunity to handle the interior design of a department store owned by The Sperry and Hutchinson Company (hereinafter S & H). So impressed were S & H officials with Mr. Dahme's work that soon Grand Rapids became involved in designing S & H stamp redemption centers and manufacturing fixtures therefor. Later, at the request of S & H, Mr. Dahme formed and headed a group within Grand Rapids which worked, as a coordinated unit, on S & H store design projects.

Mr. Dahme resigned his position with Grand Rapids in May 1955, shortly before that company was to liquidate, and on June 1, 1955, formed a sole proprietorship, Allen H. Dahme Associates (hereinafter Associates). Mr. Dahme envisioned that Associates would offer a total store design service based upon a new concept in merchandising and store fixtures. Dahme's new concept, which had once been rejected by Grand Rapids, involved the open display of merchandise on shelves and other types of fixtures which would enable customers to see and actually touch the merchandise.

The core of Associates' organization consisted of Dahme; Irving A. Howell, an experienced draftsman; and Richard B. Hough, an artist. Howell and Hough had formerly been employed by Grand Rapids and were part of the group which was assigned to the S & H account under the supervision of Dahme. Although Howell and Hough were undoubtedly valued employees of Associates, Dahme was the chief executive and, among other things, he supervised and coordinated the work performed by the organization, formulated policy, and negotiated contract prices.

One of Associates' first undertakings was a presentation of the new merchandising idea to S & H officials who then retained Associates on a trial basis to implement the new idea in the remodeling of one of S & H's stamp redemption centers. The newly remodeled center

---

* This opinion contains all necessary findings of fact. The court acknowledges the helpfulness of the exhaustive findings of fact prepared, at its direction, by Trial Commissioner Franklin M. Stone. While we reach the same ultimate result as did Commissioner Stone, we do so for different reasons.

1. Int.Rev.Code of 1954.

opened in the fall of 1955; the S & H management was delighted with the results of the trial, and Associates became the designer of the interiors of S & H redemption centers throughout the nation and the supplier of fixtures for the centers in the central part of the United States. During its 1-year existence Associates had sales totaling $362,453, of which $346,149 (or about 95.4 percent) was attributable to S & H.

Associates was incorporated June 1, 1956. Mr. Dahme was the sole shareholder of the new corporation, plaintiff in this action. All of Associates' assets, subject to liabilities, were transferred by Mr. Dahme to plaintiff in exchange for 75,000 shares of plaintiff's $1 par value common stock and $125,000 of the corporation's 6 percent, 20-year debenture bonds.

For purposes of the transaction, plaintiff accepted the valuation placed upon Associates' assets by the latter's accountant, who, undeterred by the fact that the net worth of Associates' tangible assets was a mere $15,793.65, valued the total assets of this yearling business at slightly over $200,000. In arriving at this figure the accountant utilized the "capitalization of earnings" method. The earnings for a representative period of the firm's business history were annualized. (Usually the representative period selected consists of several years. In this case, however, due to the short history of the enterprise, the period selected consisted of the 5 months immediately preceding sale of the firm's assets to plaintiff.) From this figure was subtracted the amount of earnings deemed attributable to tangible assets. The remainder was attributed to intangible assets and capitalized at a rate of 33⅓ percent.[2] When added, the capitalized value of the intangibles plus the value of the tangible assets totaled slightly more than $200,000.

After computing the net worth of Associates' business and adjusting that figure downward to $200,000, and after consulting with Mr. Dahme's attorney, the accountant arbitrarily allocated the capitalized and adjusted value of the intangibles to "designs" and "goodwill," $34,206.35 to the former and $150,000 to the latter. The allocation was made although, admittedly, it was not known how many designs were in existence or what it would cost to replace them. Plaintiff's final opening balance sheet is summarized below:

**Assets**

| | | |
|---|---|---|
| Current | $50,049.37 | |
| Fixed | 3,482.53 | |
| | | $53,531.90 |
| Other: | | |
| Designs | 34,206.35 | |
| Goodwill | 150,000.00 | 184,206.35 |
| | | $237,738.25 |

**Liabilities**

| | | |
|---|---|---|
| Current | $37,738.25 | |
| Debentures | 125,000.00 | |
| Common Stock | 75,000.00 | |
| | | $237,738.25 |

There is no dispute as to the value of the tangible assets, and defendant accepts the value placed on the designs.[3] The total value of these assets was $50,000. Plaintiff issued, however, 75,000 shares of $1 par stock and $125,000 in 6 percent, 20-year debenture bonds. Therefore, in order to show that any of the debenture bonds were issued for consideration, plaintiff must prove that it received from Associates goodwill in an amount greater than $25,000.[4] In our view plaintiff has failed in this effort.

 According to the capitalization of earnings method of computing the value of goodwill, "[g]ood will equals a-b,

---

2. The accountant used this rate instead of a higher rate in order to give recognition to the personal importance of Mr. Dahme to the business and in consideration of the short business history available at the time the computations were made.

3. Although plaintiff argues that the designs had a greater value, we see no reason to disturb the valuation placed on the designs by plaintiff at the time of the transaction.

4. The parties agree that the consideration received by plaintiff in the transaction should be attributed first to the stock issued.

where 'a' is capitalized earning power and 'b' is the value of assets used in the business." George J. Staab, 20 T.C. 834, 840 (1953). The capitalization of earnings formula is, however, neither an automatic nor a conclusive means of proving the value of intangible assets such as goodwill. It is not a preferred method of proof and is controlling only where there exists no better basis for determining the value of the intangible assets of a business. *See* International Heater Co., 10 CCH Tax Ct.Mem. 656, 660 (1951); James B. Sipe & Co., 9 CCH Tax Ct.Mem. 154, 158 (1950); Rev.Rul. 68–609, 1968–2 Cum.Bull. 327, 328.

In *Peter Vamvaks*, 4 CCH Tax Ct.Mem. 733 (1945), the imperfection of the formula can be vividly seen. In that case, the formula was used by the Commissioner to show that a laundry had, at liquidation, valuable goodwill in the amount of $159,775.20. The testimony of the witnesses, however, convinced the Tax Court that, due to the nature of the business, no goodwill whatsoever existed. We must, therefore, carefully scrutinize any computation of goodwill using the capitalization of earnings formula with an eye toward discovering any defects in its use.

Goodwill is an asset which normally is not acquired in a relatively short period of time. In *Erwin D. Friedlaender*, 26 T.C. 1005 (1956), the Tax Court commented as follows:

> In an early case we pointed out that "one of the chief factors in the development and growth of goodwill is long continued business under the same or similar names and in the same community." *Theo. Planz, Inc.*, 10 B. T.A. 1158, 1159. * * *

> We do not question that goodwill may be attached to a particular location, see *Morris Gumpel, Executor*, 2 B.T.A. 1127, but, in our opinion, all of the factors which must be considered in determining whether or not goodwill exists involve an element of time.

> Essentially, the goodwill of a business is the potential of that business to realize earnings in excess of the amount which might be considered a normal return from the investment in the tangible assets. Only the passage of time can establish the criteria whereby the existence and value of such potential can be determined, and we have been reluctant to attempt to value goodwill where the determining factors may have been in existence for only a short period. * * *

*Id.* at 1017. In this connection it should be noted that the Internal Revenue Service takes the position that the period of past earnings to which the capitalization of earnings formula is applied should, ordinarily, not be less than 5 years. *See* Rev.Rul. 68–609, 1968–2 Cum.Bull. 327, 328.

It would be difficult to imagine a clearer case than this one for illustrating at least one defect in the formula—it fails to take into account the time element, an essential ingredient of goodwill. Although in rare cases courts have valued the goodwill of a business after a relatively short period of operation,[5] such a valuation should not be made, particularly where the formula is relied upon, except in the most extraordinary of circumstances.

Associates was a successful business organization, and we do not deny that it possessed some goodwill. Common sense dictates that, normally, the very fact that a business is successful evidences some goodwill. But the nature of Associates' business and its short duration convince us that the formula method used to prove the value of goodwill resulted in a vast and erroneous overevaluation.

The sole proprietorship for which plaintiff was substituted had a total life span of 1 year, of which only 5 months were determined by the firm's accountant to be "representative," and the new idea around which the proprietorship was formed had barely emerged from its

---

5. *E. g.*, Sidney v. LeVine, 24 T.C. 147 (1955) (28 months).

incubatory period when the firm's assets were sold. Moreover, the firm did not have what might be called a widespread clientele. Its success, and the degree of it, depended almost entirely on one customer. In short, after 1 year's existence the probability that Associates' business would continue, in the future, to operate at approximately the level of profitability exhibited in its last 5 months was too uncertain to warrant any but a conservative valuation of its goodwill. It should also be pointed out that much of Associates' success very probably was due to "the exercise of business judgment, or to fortuitous circumstances in no wise related to good will." Estate of Leopold Kaffie, 44 B.T.A. 843, 850 (1941). Associates was born during a period of accelerated growth for S & H, and this, no doubt, accounted for a large part of Associates' success. In addition, Mr. Dahme's acquaintanceships, personal qualifications, and participation were indispensible to, and largely responsible for, Associates' success during that first year. Such special personal skills and relationships, not transferable or replaceable and not committed to the business, cannot be counted in evaluating the goodwill of a new and fledgling organization. See Merle P. Brooks, 36 T.C. 1128, 1134 (1961).

There was testimony in this case that plaintiff's earnings substantiate the formula valuation of Associates' intangible assets. We view this testimony as going to the value of plaintiff's goodwill, however, and not to that of Associates, its predecessor. As the Tax Court has said, "large profits earned subsequent to incorporation is [sic] not convincing evidence that good will was acquired from predecessor concerns." Holters Co., 16 B.T.A. 325, 332 (1929).

In Jack Daniel Distillery v. United States, 379 F.2d 569, 180 Ct.Cl. 308 (1967), this court approved a similar capitalization of earnings method (or the "residuary" method, as it was called) of computing the value of the goodwill of a distillery business approximately 90 years old. At the time of the valuation, the brand name of the whiskey produced by the distillery was one of the most widely known in the United States. Far from being a blanket endorsement of the formula method, however, the Jack Daniel case can only be read to indicate that in proper cases the formula method will be acceptable. Crucial to the court's decision in that case was the fact that the valuation was the product of good faith bargaining between economically adverse parties.

The residuary method, though lacking in precision for use in all cases, may in a proper case be accepted as the reasonable way to value goodwill. When it is the method actually used in good faith by the parties to the sales transaction, as in the present case, and when such parties have reasonably established the value of all other assets, there appears to be no compelling reason for rejecting it. * * * The parties actively bargained in good faith over the value of the goodwill after they had settled on the value of the other assets. * * *

Id. at 325, 379 F.2d at 579–80. In the present case there is no evidence of any real bargaining, and if there were it would be meaningless because the party selling and the real party purchasing Associates' business were one and the same.

While we are satisfied that after 1 year's existence Associates had some goodwill, we are not satisfied that the formula approach taken by plaintiff accurately reflected its value, and we are not persuaded from the record that the value of the firm's goodwill, whatever it was, exceeded $25,000. The plaintiff has failed in its burden of proof. We must hold, therefore, that the debenture bonds issued by plaintiff were issued without consideration.

Without characterizing the issuance of the bonds as a sham, we are content to say that, because of the absence of consideration for the issuance of the bonds, the creation of the indebtedness lacked purpose and substance apart from expected tax consequences. As in Rothschild v. United States, 407 F.2d 404, 186

Ct.Cl. 709 (1969), "[t]he transaction here could not appreciably affect [taxpayer's] beneficial interest except to reduce [its] tax." *Id.* at 731–32, 407 F.2d at 417. Therefore, no interest deduction can be allowed.

## CONCLUSION OF LAW

Upon the foregoing opinion, which contains the necessary findings of fact, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.