# United States Court of Appeals
# for the Federal Circuit

———————————————

**ALTA WIND I OWNER LESSOR C, ALTA WIND I
OWNER LESSOR D, ALTA WIND II OWNER
LESSOR A, ALTA WIND II OWNER LESSOR B,
ALTA WIND II OWNER LESSOR C, ALTA WIND II
OWNER LESSOR D, ALTA WIND II OWNER
LESSOR E, ALTA WIND III OWNER LESSOR A,
ALTA WIND III OWNER LESSOR B, ALTA WIND III
OWNER LESSOR C, ALTA WIND III OWNER
LESSOR D, ALTA WIND IV OWNER LESSOR A,
ALTA WIND IV OWNER LESSOR B, ALTA WIND IV
OWNER LESSOR C, ALTA WIND IV OWNER
LESSOR D, MUSTANG HILLS, LLC, ALTA WIND V
OWNER LESSOR A, ALTA WIND V OWNER
LESSOR B, ALTA WIND V OWNER LESSOR C,
ALTA WIND V OWNER LESSOR D,**
*Plaintiffs-Appellees*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

———————————————

2017-1410, 2017-1411, 2017-1412, 2017-1415, 2017-1417,
2017-1422, 2017-1423, 2017-1424

———————————————

Appeals from the United States Court of Federal
Claims in Nos. 1:13-cv-00402-TCW, 1:13-cv-00917-TCW,
1:13-cv-00935-TCW, 1:13-cv-00972-TCW, 1:14-cv-00047-
TCW, 1:14-cv-00093-TCW, 1:14-cv-00174-TCW, 1:14-cv-
00175-TCW, Judge Thomas C. Wheeler.

———————————

Decided: July 27, 2018

———————————

STEVEN ROSENBAUM, Covington & Burling LLP, Washington, DC, argued for plaintiffs-appellees. Also represented by DENNIS AUERBACH, MARGARET BRENNAN, THOMAS BRUGATO.

ANDREW M. WEINER, Tax Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by DAVID A. HUBBERT, JONATHAN S. COHEN, GILBERT STEVEN ROTHENBERG, FRANCESCA UGOLINI.

———————————

Before NEWMAN, DYK, and CHEN, *Circuit Judges.*

DYK, *Circuit Judge.*

In order to encourage the construction of alternative energy production facilities, Congress enacted section 1603 of the American Recovery and Reinvestment Act (ARRA) of 2009, Pub. L. No. 111-5, 123 Stat. 115, 364–66 (set forth at I.R.C. § 48 note), which provides a cash grant to entities that "place[] in service" certain renewable energy facilities, *id.* § 1603(a). The amount of the grant is determined using the basis of the tangible personal property of the facility (with certain exclusions). *Id.* § 1603(b)(1).

Here, plaintiffs, the owners of the Alta windfarms, placed into service various windfarm facilities and applied for approximately $703 million in section 1603 grants. The government awarded grants in the amount of approximately $495 million. Plaintiffs brought suit in the Court of Federal Claims ("Claims Court"), seeking approximately $206 million in additional grant payments, and the

government counterclaimed, asserting that it had overpaid plaintiffs in the amount of $59 million. The difference in the amounts was attributable solely to different methods for calculating basis. The Claims Court found in favor of plaintiffs, approving their method of basis calculation and rejecting the government's argument that basis must be calculated using the residual method of I.R.C. § 1060, which applies in the case of an acquisition of a trade or business. The government argues that, under the residual method, the overall purchase price must be allocated on a waterfall basis among several categories of assets, some grant-eligible and some not, resulting in a lower basis in eligible property than plaintiffs' method.

On appeal, we hold that the Claims Court erred in refusing to utilize the residual method of I.R.C. § 1060 and in excluding the testimony of the government's expert witness as to the appropriate basis calculation. We vacate and remand.

BACKGROUND

I

Congress has long used tax incentives to promote investment in new renewable energy projects. Initially, these incentives came in the form of tax credits—specifically the production tax credit ("PTC") under I.R.C. § 45 and the investment tax credit ("ITC") under I.R.C. § 48. It was often the case, however, that renewable energy investors could not directly monetize these tax credits because "the size of tax benefits available for renewable energy investors . . . exceeded the investor's tax liability." Phillip Brown & Molly F. Sherlock, Cong. Research Serv., R41635, ARRA Section 1603 Grants in Lieu of Tax Credits for Renewable Energy 1 (2011). For this reason, it became "common industry practice for renewable energy developers to partner with tax-equity investors, where the tax-equity investors [would] offer

cash in exchange for project ownership, project cash flows, tax credits, and depreciation benefits." *Id.* By 2009, however, poor economic conditions had reduced the availability of tax-equity investors for renewable energy projects. *Id.* at 1, 16. Congress created the section 1603 grant program, which has since expired, to address this tax-equity shortfall. *Id.* at 16.[1]

Under section 1603, "each person who place[d] in service specified energy property" during a designated period, ARRA § 1603(a), was entitled to receive a cash grant equal to a percentage—here, 30 percent, *id.* § 1603(b)(2)A)—of the "basis" of the specified energy property, *id.* § 1603(b)(1). Specified energy property, which the parties also refer to as "eligible property," is defined by references to § 45 and § 48 of the Internal Revenue Code. ARRA § 1603(d). "Eligible property" only

---

[1]    *See also* Staff of Joint Comm. on Taxation, JCS-2-11, *General Explanation of Tax Legislation Enacted in the 111th Congress* 109–10 (2011) ("The Congress understands that some investors in renewable energy projects have suffered economic losses that prevent them from benefitting from the renewable electricity production credit and the energy credit. . . . The Congress therefore believes that, in the short term, allowing renewable energy developers to elect to receive direct grants in lieu of the renewable electricity production credit and the energy credit is necessary for continued growth in this important industry."); Office of the Fiscal Assistant Sec'y, U.S. Treasury Dep't, *Payments for Specified Energy Property in Lieu of Tax Credits under the American Recovery and Reinvestment Act of 2009: Program Guidance* 3 (2011) [hereinafter *Program Guidance*] ("It is expected that the Section 1603 program will temporarily fill the gap created by the diminished investor demand for tax credits.").

includes tangible personal property and other tangible property, used as an integral part of the facility, for which depreciation or amortization is allowable.[2] It does not include real estate, buildings, or transmission equipment. It also does not include intangibles. The amount of a section 1603 grant is determined by the basis of the eligible property. ARRA § 1603(b)(1).

II

Between 2010 and 2012, plaintiffs acquired six completed windfarm facilities near Los Angeles, California— Alta I, Alta II, Alta III, Alta IV, Alta V, and Alta VI (collectively "the Alta facilities")—from developer Terra-

---

[2] Specifically, section 1603(d)(1) explains that "specified energy property" includes "[a]ny qualified property (as defined in section 48(a)(5)(D) of the Internal Revenue Code of 1986) which is part of a qualified facility (within the meaning of section 45 of such Code) described in paragraph (1), (2), (3), (4), (6), (7), (9), or (11) of section 45(d) of such Code." Under I.R.C. § 45(d)(1), "qualified facility" includes "any facility using wind to produce electricity." And under I.R.C. § 48(a)(5)(D), "qualified property" includes "property (i) which is– (I) tangible personal property, or (II) other tangible property (not including a building or its structural components) . . . used as an integral part of the qualified . . . facility, (ii) with respect to which depreciation (or amortization in lieu of depreciation) is allowable." Treasury guidance for the section 1603 program further explains that "qualified property" does not include "any electrical transmission equipment, such as transmission lines and towers, or any equipment beyond the electrical transmission stage, such as transformers and distribution lines." *Program Guidance* 12; *see also* Treas. Reg. § 1.48-1.

Gen Power LLC ("Terra-Gen").[3] Five of the six transactions were sale-leasebacks, in which plaintiffs both acquired the windfarm and leased it back to Terra-Gen, which was to operate the windfarm and pay rent to plaintiffs. Immediately after the transactions, plaintiffs placed each windfarm into service and applied for section 1603 grants.

The dispute here is how to calculate plaintiffs' basis in eligible property for purposes of the section 1603 grants. Both parties agree that the portion of the purchase prices attributable to grant-ineligible tangible property (primarily real estate, transmission equipment, and buildings) must be deducted. The difference between the parties' positions concerns the allocation of the remainder of the purchase prices. Plaintiffs contend that the entire remainder can be allocated to grant-eligible tangible personal property, with none allocated to intangibles. The result would be that the entire purchase price, absent the small deduction for grant-ineligible tangible property, would be included in plaintiffs' basis. We refer to this view as the "unallocated method."

The government argues that the transactions involved intangibles, including goodwill, and that the remaining purchase price therefore must be allocated between grant-eligible tangible personal property and grant-ineligible intangibles using the residual method required by I.R.C. § 1060.

Section 1060 and corresponding Treasury regulations require that the residual method be used to calculate basis in the case of "applicable asset acquisition[s]," I.R.C.

---

[3]    When plaintiffs acquired Alta VI, the facility was renamed Mustang Hills. For clarity, we refer to it as Alta VI throughout the opinion.

§ 1060(a), which are, in relevant part, any group of assets (i) the use of which "would constitute an active trade or business under [I.R.C. §] 355," or (ii) to which "goodwill or going concern value could under any circumstances attach," Treas. Reg. § 1.1060-1(b)(2)(i). According to the government, in the residual method (or "§ 1060 method"), the overall purchase price is allocated on a waterfall basis among several categories of assets, some grant eligible and some not, with each category calculated at the fair market value of the assets in that category. *See* Treas. Reg. §§ 1.338-6(b), 1.1060-1(a)(1). We refer to this as the "residual method" or the "§ 1060 method."

Because the plaintiffs do not attribute any of the purchase price to intangibles, their unallocated method results in a much higher basis and, consequently, a much higher section 1603 grant amount than the government's residual method. Some background on the transactions is useful to an understanding of the dispute.

III

The development process began for the Alta facilities in 2006, when Oak Creek Energy Systems ("Oak Creek") entered into a partnership with Allco Wind Energy Management Pty. Ltd. ("Allco") to finance, develop, and construct windfarms in the Tehachapi region of California. Over the next two years, they secured land rights, constructed meteorological towers, collected wind data, completed environmental studies, started the environmental permitting process, and purchased some of the needed turbines.

In July 2008, Terra-Gen acquired Allco's U.S. wind energy business, including its stake in the planned Alta facilities. After acquiring Allco's interests, Terra-Gen completed the process of developing and constructing the Alta windfarms. This involved obtaining additional land, securing all required permits, acquiring additional tur-

bines, and constructing the six windfarms at issue in this case.

In addition, Terra-Gen completed the process of securing a customer for the output of the Alta facilities. In 2006, Oak Creek and Allco had executed a Master Power Purchase and Wind Project Development Agreement ("Master PPA") with Southern California Edison ("SCE"), which provided that Oak Creek and Allco would develop windfarms with an aggregate capacity of 1,550 megawatts and that SCE would purchase the windfarms' entire electricity output for a period of roughly 24 years. To effectuate this arrangement, SCE was to enter into a separate long-term PPA with each individual windfarm, with the price to be set according to a formula included in the Master PPA. Terra-Gen executed these windfarm-specific PPA contracts and entered into other necessary contracts, such as interconnection agreements.

In 2009, Congress enacted section 1603, under which the owners of the Alta windfarms could receive a cash grant in lieu of tax credits. Terra-Gen itself was not qualified to receive a section 1603 payment, as section 1603(g)(4) barred a "pass-thru entity" from receiving a grant if any "holder of an equity or profits interest" in the entity was a nonprofit, and Terra-Gen had some non-profit equity holders. Moreover, Terra-Gen apparently believed that it could increase the amount of the section 1603 grant if it sold the Alta facilities before placing them into service—because, in plaintiffs' view, the basis in grant-eligible property for each windfarm would be increased by virtue of the transaction.

Thus, Terra-Gen decided to sell the completed windfarms, allowing the purchasers to place them into service and apply for the section 1603 payments. As part of the transactions, plaintiffs agreed to apply for the section 1603 grant using their purchase price to establish

basis. Five of the six transactions included an indemnity provision, whereby Terra-Gen agreed to cover the short-fall that would occur if Treasury did not accept plaintiffs' use of their unallocated purchase price as their basis in eligible property. At the time of the transactions, the windfarms were completely ready for operation.

Between December 2010 and June 2011, Terra-Gen sold five windfarms (Altas I–V) to plaintiffs in sale-leaseback transactions. In these sale-leaseback transactions, plaintiffs purchased the windfarms then leased them back to Terra-Gen, which operated the windfarms and paid rent to plaintiffs.[4] In 2012, Terra-Gen sold a sixth windfarm, Alta VI, to one of the plaintiffs in an outright sale. Plaintiffs appear to have placed each facility into service within weeks of its acquisition.

After acquiring the Alta facilities and placing the windfarms in service, plaintiffs, with Terra-Gen's assistance, collectively applied for over $703 million in section 1603 grants using the unallocated method to determine basis. In accordance with Treasury's requirement that companies applying for a section 1603 grant provide an opinion from an independent auditor validating the claimed grant-eligible costs, plaintiffs retained KPMG to examine their applications. KPMG certified that plaintiffs' allocations were fairly stated. Ultimately, Treasury awarded payments equal to 30 percent of each facility's grant-eligible construction and development costs—approximately $495 million in all—instead of awarding payments equal to 30 percent of each facility's unallocated basis as requested.

---

[4]    Plaintiffs are trusts that were created by renewable energy investors for purposes of holding the property and applying for the section 1603 grants.

IV

In June 2013, plaintiffs separately brought suits in the Claims Court, seeking over $206 million in additional section 1603 grants and arguing that their basis calculations were correct. The government argued that plaintiffs were not entitled to the additional grant amount and that, in fact, the government had overpaid plaintiffs in the amount of $59 million. The government counterclaimed for the excess.

In the government's view, the purchase prices for the Alta facilities did not reflect the fair market value of the tangible, grant-eligible property utilized by each wind-farm, as required by section 1603. In particular, the government argued that the Alta transactions were "applicable asset acquisitions" subject to I.R.C. § 1060, which requires allocation of the purchase price to various asset classes using the residual method. The government also argued that the court was required to look beyond the purchase prices to the value of the relevant assets (here, the eligible property) because the sale-leaseback structure and the section 1603 indemnities in the transactions constituted "peculiar circumstances" that induced plaintiffs to pay more than fair market value for the wind-farms. *See Lemmen v. Comm'r*, 77 T.C. 1326, 1348 (1981) (quoting *Bixby v. Comm'r*, 58 T.C. 757, 776 (1972)).

The Claims Court consolidated the cases and, in May 2016, held a nine-day trial in which plaintiffs relied on seven fact witnesses and two experts and the government relied on two fact witnesses and one expert. As discussed below, the Claims Court granted plaintiffs' motion to exclude the testimony of the government's expert, Dr. John Parsons, based on the expert's supposed perjury as to the listing of prior publications on his resume. This left the government with no evidence as to the proper allocation of plaintiffs' purchase prices.

After trial, the Claims Court held for the plaintiffs. *Alta Wind I Owner-Lessor C v. United States*, 128 Fed. Cl. 702, 722 (2016). In the Claims Court's view, no goodwill or going concern value could have existed at the time of the transfer because the facilities were not yet operational. *Id.* at 716. As such, § 1060 did not apply, and there was no need to calculate basis according the residual method. Thus, plaintiffs' basis in the windfarms could be calculated using the unallocated method, with no part of the purchase price attributed to intangibles. The court characterized the additional value the windfarms had over their development and construction costs as "turn-key value," which, the court said, "essentially describes value a facility has when it is ready for immediate use after purchase" and which should be treated as part of the basis in tangible, grant-eligible property. *Id.* at 717.

The Claims Court also concluded that there were no peculiar circumstances inflating the purchase price. *Id.* at 718–20. As such, the court determined that the purchase prices for the eligible, tangible assets, as calculated by plaintiffs, constituted the basis for the section 1603 grant. *Id.* at 722.

The government timely appealed. We consolidated the appeals, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

Section 1603 entitles plaintiffs to a cash grant equal to 30 percent of the basis of their "specified energy property"—the tangible personal property and other tangible property (not including real estate, buildings, and transmission equipment) integral to plaintiffs' windfarm facilities. *See* ARRA § 1603; I.R.C. § 48(a)(5)(D); Treas. Reg. § 1.48-1; *Program Guidance* 12. The parties disagree about how to calculate the basis.

Plaintiffs argue that, under the general rule that "the basis of property is . . . the amount paid for such property," Treas. Reg. § 1.1012-1; *see also* I.R.C. § 1012(a), the basis for section 1603 purposes is equal to each facility's purchase price minus a small portion attributable to grant-ineligible tangibles. In plaintiffs' view, none of the purchase price should be allocated to intangibles. The government argues that the Alta transactions are subject to I.R.C. § 1060, which requires that plaintiffs' basis in eligible property be determined using the residual method, in which the overall purchase price would be allocated on a waterfall basis among several categories of assets, some grant-eligible and some not. *See* Treas. Reg. §1.338-6(b) (explaining the residual method of allocation). Use of the residual method would result in a substantial portion of each purchase price being allocated to grant-ineligible assets, such as goodwill, going concern value, and other intangibles.

I

Section 1060 and implementing regulations require that the residual method be used to calculate basis in the case of "applicable asset acquisition[s]," I.R.C. § 1060(a), which the statue defines in relevant part as "any transfer . . . of assets which constitute a trade or business," *Id.* § 1060(c). Treasury regulations broadly define "assets constituting a trade or business" as any group of assets (A) the use of which "would constitute an active trade or business under [I.R.C. § 355]," or (B) to which "goodwill or going concern value could under any circumstances attach." Treas. Reg. § 1.1060-1(b)(2)(i)(A)–(B). The regulations define "goodwill" as "the value of a trade or business attributable to the expectancy of continued customer patronage" and define "going concern value" as "the additional value that attaches to property because of its existence as an integral part of an ongoing business activity." *Id.* § 1.1060-1(b)(2)(ii). While the Alta assets at

the time of the sale did not constitute an "active trade or business under section 355,"[5] the government argues that they did constitute assets as to which, in the language of the Treasury regulation, "goodwill or going concern value could under any circumstances attach." *Id.*

The Claims Court determined as a matter of law that § 1060 did not apply because no goodwill or going concern value could have attached to the Alta windfarms at the time of the transaction. In the Claims Court's view, "the fact that the Alta facilities . . . were not yet operational when purchased" was "dispositive" of the absence of goodwill and going-concern. *Alta Wind*, 128 Fed. Cl. at 716. We disagree with the Claims Court. A group of assets constitutes a trade or business if the "character" of the group of assets transferred "is such that goodwill or going concern value could under any circumstances attach." Treas. Reg. § 1.1060-1(b)(2)(i)(B). There is no need to show that a transaction had actual, accrued goodwill or going concern value at the time of the transaction. *See id.* § 1.1060-1(b)(2)(iii) ("Whether sufficient consideration is available to allocate to goodwill or going concern value after the residual method is applied is not relevant in determining whether goodwill or going concern value could attach to a group of assets.").

In making this determination, "all the facts and circumstances surrounding the transaction" are taken into account. *Id.* Treasury regulations set out a non-exhaustive set of factors that indicate that goodwill or going concern value could attach, including: (1) "[t]he

---

[5]    To be treated as an "active business" under § 355, a corporation must be, among other things, "engaged in the active conduct of a trade or business . . . throughout the 5-year period ending on the date of the distribution." I.R.C. § 355(b)(2)(A)–(B).

presence of any intangible assets"; (2) "[t]he existence of an excess of the total consideration over the aggregate book value of the tangible and intangible assets purchased"; and (3) "[r]elated transactions, including lease agreements, licenses, or other similar agreements between the purchaser and seller . . . in connection with the transfer." *Id.* § 1.1060-1(b)(2)(iii)(A)–(C).

There is no dispute that the second two factors are present in the Alta transactions. The purchase prices for the Alta facilities were well in excess of their development and construction costs (i.e., book value), and the transactions involved numerous related agreements, such as the leasebacks to Terra-Gen and grant-related indemnities. *See Alta Wind*, 128 Fed. Cl. at 716–18.

As to the first factor, "[t]he presence of any intangible assets," the government argues that the transactions included numerous intangible assets, such as the PPAs. The Claims Court held that no intangible assets were present, explaining that PPAs should not be treated as separate intangible assets because they "relate only to their specific wind farm facilities and are not transferable or assignable." *Id.* at 721. But we think that customer relationships, like goodwill itself, can exist as separate intangibles even if they are associated with a particular facility. In the Master PPA, which preceded the completion of any of the Alta windfarms at issue, a customer committed to purchase all of the energy the windfarms could produce for 24 years with prices to be set according to a known formula. For that reason, the PPAs, or at least some portion thereof, may be characterized as customer-based intangible assets under I.R.C. § 197. *See* I.R.C. § 197(d)(2)(A)(iii) (defining customer-based intangible as "value resulting from future provision of goods or services pursuant to relationships (contractual or otherwise) in the

ordinary course of business with customers"). [6] It also appears that plaintiffs acquired other intangibles, such as transmission rights, which ensured that the windfarms would be able to connect to the larger electrical grid. [7] Thus, at least some intangible assets were present in the Alta transactions. It therefore appears that each of the three factors cited in the regulation as indicative of goodwill was present in this case. *See* Treas. Reg. § 1.1060-1(b)(2)(iii).

On appeal, plaintiffs argue that no goodwill value could stem from PPAs—which are long-term contracts to sell all of each windfarm's power output—because goodwill is the expectancy of continued customer patronage without contractual compulsion. Plaintiffs rely on a passing reference to this effect in *Karan v. Comm'r*, 319 F.2d 303, 306 (7th Cir. 1963), but do not cite to any circuit holding that contracts cannot contribute to goodwill. The Claims Court did not adopt this theory, recognizing instead that, at least once the windfarms began operation, "goodwill might accumulate in the form of an expectation that the parties would not breach the PPAs, or that the parties might renew the PPAs." *Alta Wind*, 128 Fed. Cl. at 716. We think that plaintiffs' theory is not correct, and

---

[6] Plaintiffs argue that any contracts can only be treated as separate intangible assets if their terms are more favorable than market. The Claims Court did not reach this issue. *See Alta Wind*, 128 Fed. Cl. at 721–22.

[7] The Claims Court apparently agreed that transmission rights could be intangibles, but found that plaintiffs' calculations had already treated the value of transmission agreements as grant-ineligible property (i.e. as part of the transmission lines) for allocation purposes. *Alta Wind*, 128 Fed. Cl. at 721 n.10. This treatment does not prevent consideration of transmission rights as intangibles for determining whether § 1060 applies.

that goodwill can arise based on contracts. As explained below, Example 4 in the regulation itself supports the view that goodwill can arise from a contractual relationship. Treas. Reg. § 1.1060-1(b)(3).

In another theory not adopted by the Claims Court, plaintiffs argue that goodwill cannot exist before a business has been operating for a significant period, relying primarily on *Allen H. Dahme Associates, Inc. v. United States*, 436 F.2d 486 (Ct. Cl. 1971). *Dahme* is inapposite, as it addressed the propriety of using a capitalization-of-earnings-based formula for the valuation of goodwill and simply held that the "formula method" of valuing goodwill is inappropriate where the business has only been in operation for a short period (one year in *Dahme*). *Id.* at 490. The court recognized that the business in *Dahme* did have some goodwill, even if it could not be calculated using the formula method. *Id.* ("While we are satisfied that after one year's existence [the business] had some goodwill, we are not satisfied that the formula approach taken by plaintiff accurately reflected its value . . . ."). In the context of this formula method, the Internal Revenue Service typically required a five year history of earnings to ensure that "[t]he past earnings to which the formula is applied . . . fairly reflect the probable future earnings," Rev. Rul. 68–609, 1968–2 C.B. 327, but the formula method is not at issue in this case.

Here, the regulation provides that a group of assets can constitute a trade or business either if "(A) [t]he use of such assets would constitute an active trade or business under [I.R.C. §] 355," or if "(B) [i]ts character is such that goodwill or going concern value could under any circumstances attach to such group." Treas. Reg. § 1.1060-1(b)(2)(i). While category A applies only if a corporation has been engaged in the active conduct of a trade or business "throughout the 5-year period ending on the date

of the distribution," I.R.C. § 355(b)(2)(B), category B has no fixed time restriction.

The Claims Court ultimately rejected § 1060 because "both parties had not yet begun performance under the PPAs at the time of purchase," so the "expectancy [of continued customer patronage] could not have existed at that time, [and therefore] goodwill could not have attached." *Alta Wind*, 128 Fed. Cl. at 716. Although it may be that there was technically no goodwill at the time of the transaction, it was readily apparent that goodwill could attach once the windfarms began operation—which was to occur immediately after the transaction—and this expectation of goodwill was baked into each purchase price. While it may not be relevant that a new entity expects goodwill to be generated at some distant future time, we think the regulation is clearly applicable in the circumstances of this case, where goodwill could attach to the transferred assets immediately after the transaction in question.

At the time of the transactions, the Alta facilities were on the cusp of operation. They had already entered PPAs with their only customer, SCE, and no further construction or development work was necessary. In this way, plaintiffs' relationship with SCE was largely identical to the kind of customer relationship that an operating business has with its customers. At the time, SCE had a substantial history of interactions with owners of the Alta windfarms, which could have contributed to the development of goodwill. In 2006, SCE negotiated the Master PPA and committed to purchase all of the energy the Alta facilities could produce for a period of roughly 24 years, with prices set according to a particular formula. Before plaintiffs acquired the windfarms, SCE entered into PPAs for each Alta facility. These PPAs finalized pricing and set out both an expected initial operation date and a firm operation date by which the facility would start providing

SCE with power. The insubstantial difference between the situation prevailing before and after the transfer is demonstrated by the Claims Court's determination that, after the transfer and beginning of performance, "goodwill might accumulate in the form of an expectation that the parties would not breach the PPAs, or that the parties might renew the PPAs"—expectations that would have appeared to exist even before the transfer and beginning of performance. *Alta Wind*, 128 Fed. Cl. at 716.

It is also noteworthy that the purchase prices for the Alta facilities were negotiated based on anticipated cash flows that would occur once the facilities became operational. Those cash flows depended on—and were valued with reference to—intangible assets such as PPAs. In short, when plaintiffs purchased the windfarms, they were purchasing the expectation of future cash flows based on an established customer relationship.

Finally, the regulations themselves make clear that a business that is not yet operational (in the sense that it is not yet serving customers and generating revenue) can have goodwill. Example 4 of Treas. Reg. § 1.1060-1(b)(3) describes a transaction in which a manufacturing company sells its internal bookkeeping department to a bookkeeping business and enters into a long-term service contract with that business. At the time it was sold, the internal bookkeeping department in Example 4 had conducted no external business and had no customers. It generated no revenue until after the sale. So while goodwill, according to the regulation, "is the value of a trade or business attributable to the expectancy of continued customer patronage," *id.* § 1.1060-1(b)(2)(ii), Example 4 makes clear that goodwill can attach and § 1060 can apply even when that expectancy of "continued" customer patronage begins only after the transaction. Each of the Alta windfarms was sold with a preexisting PPA with a customer and was put into service (i.e., commenced being

used in a trade or business) within weeks of the date the assets were transferred. And, as the Claims Court acknowledged, they certainly could accrue goodwill value once they became operational. That prospective goodwill could well be reflected in the purchase prices, and itself constitute an intangible asset.

Thus, looking at "all the facts and circumstances surrounding the transaction" and giving particular consideration to the three factors set out in the Treasury regulations, we conclude that goodwill and going concern value could have attached to the group of assets transferred in the Alta transactions immediately after the transaction and that those assets constitute a "trade or business" within the meaning of Treas. Reg. § 1060-1(b)(2). The Alta transactions therefore count as "applicable asset acquisitions" for purposes of § 1060, and their purchase prices must be allocated using the residual method.

## II

Having determined the Alta transactions are "applicable asset acquisitions" for purposes of § 1060, we must remand to the Claims Court to determine the proper allocation of the purchase prices. Section 1060 requires that, in the case of an applicable asset acquisition, "the consideration received . . . be allocated among such assets acquired . . . in the same manner as amounts are allocated to assets under [I.R.C. §] 338(b)(5)." The regulations implementing I.R.C. § 338 set out a method of allocation—the residual method—in which the consideration is distributed among seven asset classes, some classes for tangible assets and others for intangible assets. Those asset classes include:

Class I: Cash and general deposit accounts.

Class II: Actively traded personal property, certificates of deposits, U.S. government securities and publicly traded stock.

Class III: Debt instruments.

Class IV: Inventory and other property held for sale to customers.

Class V: Assets that do not fit within any other class, including tangible property.

Class VI: I.R.C. § 197 intangibles, including contract rights, but not goodwill and going concern value.

Class VII: Goodwill and going concern value.

*See* Treas. Reg. § 1.338-6(b). The consideration is allocated among these classes in the order they are listed in a "waterfall" fashion, using the fair market value of the assets within each class. *See id.* The parties agree that none of the assets at issue in this case fits within Class I, II, III, or IV. As noted above, the Alta transactions included both tangible property and intangible property (including PPAs). The purchase price must therefore be allocated to Class V, then to Class VI, and finally to Class VII, if any value remains.[8]

---

[8]    Plaintiffs argue that the portion of the purchase price attributable to the expected section 1603 grants and any associated indemnities are not separate from the value of the windfarms' tangible personal property. Relying on bankruptcy cases that hold that a tax benefit is treated as part of an asset, *see, e.g.*, *U.S. Bank N.A. v. Lewis & Clark Apartments, LP* (*In re Lewis & Clark Apartments, LP*), 479 B.R. 47, 53–54 (B.A.P. 8th Cir. 2012); *In re Creekside Senior Apartments, LP*, 477 B.R. 40, 60 (B.A.P. 6th Cir. 2012), they argue that the same

In this connection, we address the issue of turn-key value and its relationship to § 1060. The Claims Court acknowledged that the purchase prices for the Alta facilities were in excess of the development and construction costs of the tangible assets making up the facilities. *Alta Wind*, 128 Fed. Cl. at 716–17. In the Claims Court's view, all of this could be attributed to turn-key value, which is the incremental value "a buyer would pay . . . for such an assurance that the plant and equipment would all work together without need of costly and time-consuming adjustments and coordination." *Miami Valley Broad. Corp. v. United States*, 499 F.2d 677, 680 (Ct. Cl. 1974). Unlike goodwill and going concern value, turn-key value is considered part of the tangible assets in a transaction rather than a separate intangible asset, *id.*, so it is a Class V asset for purposes of the residual method.

The government agrees that turn-key value accounts for some portion of the purchase price of the Alta transactions and should be treated as part of the grant-eligible tangible assets. At the time of the transactions, the tangible assets connected to the Alta facilities were fully assembled, tested, and ready for use—just as the "land, improvements, technical installations, equipment and supplies, and other physical items" that constituted the radio station in *Miami Valley*, 499 F.2d at 679, were "put-together" and "in all-round working shape, not a congeries of uncoordinated physical assets liable as not to fail to work as a unit," *id.* at 680. But turn-key value, "the increased value of the individual tangible assets because they were assembled, installed, integrated, tested, coordi-

should be true of the cash grant. We need not decide that issue in this appeal or decide whether the cash grant entitlement or associated indemnities are separate intangibles. We leave these issues to the Claims Court on remand.

nated, and in operating order," *id.* at 681, is separate from the value that comes from having secured a customer contract, regulatory approvals, transmission rights, and various other arrangements that ensured the immediate operation of the Alta windfarms. *See id.* at 682 (distinguishing going concern value from turn-key value). In applying the § 1060 residual method, the Claims Court must distinguish between turn-key value and goodwill and other intangibles.

### III

On remand, the Claims Court will have to make a factual determination as to the allocation of purchase price. Therefore, it is important to consider whether the Claims Court erred in excluding the reports and testimony of the government's sole expert, Dr. Parsons, under Federal Rule of Evidence 702. We conclude that the exclusion of his reports and testimony was reversible error.

### A

Dr. Parsons is currently the head of the MBA finance track at MIT's Sloan School of Management and the Executive Director of MIT's Center for Energy and Environmental Policy Research. He prepared an expert report and a rebuttal expert report and was prepared to testify as to the fair market value of the eligible property at the time of the Alta transactions for purposes of determining plaintiffs' basis in eligible property.

At trial, as part of the qualification of Dr. Parsons as an expert (i.e., voir dire), counsel for the government asked Dr. Parsons about his experience. This resulted in a lengthy discussion of Dr. Parsons' academic focus on "applied research in the area of energy finance," for which "valuation and financing of projects is the main core," with additional work on "derivatives and how they're used by companies to hedge their risk." J.A. 73300. On cross-

examination, plaintiffs' counsel focused on a nine-page list of publications on the curriculum vitae ("CV") attached to Dr. Parsons' expert report—a list that appeared under the heading "Research and Publications." J.A. 688-75. During a pre-trial deposition, Dr. Parsons had stated that the list of publications reflected "what I am as far as research is concerned" and that "I can't say that there might not be something from back in '85 that's not here. But . . . I think it's a complete listing of my materials." J.A. 73314. Plaintiffs' counsel then introduced five articles discussing various aspects of socialist thought and economic theory that Dr. Parsons had published between 1986 and 1989, which were not listed on the CV.[9] These articles, which were not included in full in the record on appeal, described aspects of the East German economy, laid out the evolving views of East German economists, and sometimes identified relative advantages of socialism over capitalism. Plaintiffs' counsel suggested that Dr. Parsons had concealed the existence of the five articles.

Dr. Parsons was under no obligation to disclose the articles in his expert report, as Rule 26(a)(2)(B) of the

---

[9]    The articles included: (1) John E. Parsons, *Bubble, Bubble, How Much Trouble? Financial Markets, Capitalist Development and Capitalist Crises*, 52 Sci. & Soc'y 260 (1988); (2) John E. Parsons, *Forms of GDR Economic Cooperation With the Nonsocialist World*, 29 Comp. Econ. Stud. 7 (1987); (3) John E. Parsons, *Plan and Market in the Marxist Imagination: The Changing of the Guard Among GDR Economists*, German Pol. & Soc'y, Summer 1989, at 39; (4) John E. Parsons, *Which Road to Oz? New Thinking in East Germany about the World Economy and the Course of Socialism* (Leopold Classic Library, Working Paper No. 2045-88, 1989); and (5) John E. Parsons, *Credit Contracts in the GDR: Decentralized Investment Decisions in a Planned Economy*, 20 Econ. Plan. 28 (1986).

United States Court of Federal Claims, which governs
expert disclosures, only requires disclosure of "all publica-
tions authored in the previous 10 years." But the CV did
list other articles outside the ten-year period, which were
generally related to Dr. Parsons' research in energy
financing and valuation. Plaintiffs' attorney argued that
Dr. Parsons should not be permitted to testify because of
the "many falsities" related to the characterization of his
CV as accurate and complete, even though the CV did not
include the five articles about socialism. J.A. 73321.
Additionally, plaintiffs' counsel introduced an expert
report dated March 10, 1997, that Dr. Parsons had pre-
pared in another case, *Babson-United Investment Advi-
sors, Inc. v. Hulbert*, No. 96-cv-11349-REK (D. Mass.
dismissed June 26, 1998). It included an earlier version of
his CV that also made no mention of the articles, even
though, at that time, four of the articles were within the
ten-year window for disclosure of publications.

In addition to focusing on Dr. Parsons' alleged lack of
candor, plaintiffs' counsel emphasized the socialist con-
tent of the articles—characterizing certain excerpts as
"[p]ure socialist dogma," J.A. 73318, and arguing in
conclusion that Dr. Parsons "despises the capitalist sys-
tem," J.A. 73322. The Claims Court expressed similar
concern about the socialist content of the articles, stating
that "whatever [Dr. Parsons] might say about the proper
outcome in this case, I'll always have in the back of my
mind, well, that's because he wrote these socialist, Marx-
ist articles," so, "[r]egardless of the logic that [his testi-
mony] might have, I'm going to be bothered throughout
about where this guy is coming from." J.A. 73323. The
Claims Court also expressed its view that, even if "we
were to go forward and hear his testimony . . . related to
the valuation of the Alta Wind facilities, I would still be
seriously questioning his testimony in view of these
articles about socialism, Marxism, and capitalism." *Id.*

The court then took a one-hour recess. Upon reconvening, the government requested the opportunity to question Dr. Parsons on redirect. The court refused to allow such redirect testimony. The court stated that it was going to exclude Dr. Parsons' testimony under Rule 702, explaining that:

> The big problem is that he was not truthful with the Court, and no matter how much we might further consider what explanations he could offer to that, the fact remains that nothing that happens from here on out could change the fact that this person has serious reliability and credibility problems. So, no matter how cogent his thinking, his economic theories might be, I just cannot accept this witness as an expert under Rule 702. I think there are serious issues with his credibility and reliability, and there's no reason really to consider the matter further.

J.A. 73324. The Claims Court also stated, contrary to its prior statements, that the exclusion had "nothing to do whatever with the fact that [Dr. Parsons] has certain ideological views or he once had them back in the eighties and nineties." *Id.*

### B

The Claims Court's construction and application of Rule 702 is an issue governed by Federal Circuit law. *See Panduit Corp. v. All States Plastic Mfg. Co.*, 744 F.2d 1564, 1575 (Fed. Cir. 1984) (per curiam), *overruled on other grounds by Richardson-Merrell, Inc. v. Koller*, 472 U.S. 424, 432 (1985). Rule 702, which governs the standards for expert witnesses, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. An expert's credibility generally is not relevant to determining the admissibility of his or her testimony. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court explained that the Rule 702 inquiry is "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141 (1999) (concluding that "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge"). Rule 702 is therefore addressed to determining the validity of an expert's scientific or other methodology.

Here, plaintiffs did not seek to exclude Dr. Parson's testimony based on any flaws in his methodology. There is no mention in Rule 702 itself or the Supreme Court's Rule 702 cases suggesting that assessment of an expert's credibility is required apart from the issue of methodology.

In excluding Dr. Parsons' testimony, the Claims Court relied on *Meinhardt v. Unisys Corp. (In re Unisys Savings Plan Litigation)*, 173 F.3d 145, 155–56 (3d Cir. 1999), for the proposition that a trial court can exclude under Rule 702 the testimony of an expert witness deemed not credible due to misrepresentation of his qualifications. In that case, the Third Circuit emphasized that *Daubert* paints the district court as a kind of "gatekeeper," responsible for screening evidence to ensure that it is reliable as well as relevant. *Id.* at 155. "Thus in our view," the Third Circuit explained, "the [Supreme] Court's emphasis on reliability as well as on relevancy embraces within its standard the credibility of the witness proffering expert opinion." *Id.* at 156. The *Unisys* court believed that considering an expert's credibility under Rule 702 is particularly appropriate where "it is the district court judge sitting as a finder of fact who must rule on issues of evidence." *Id.*

The Third Circuit has since suggested that *Unisys* is no longer good law. In *Elcock v. Kmart Corp.*, the Third Circuit concluded that, while there may be some circumstances where a judge can properly evaluate an expert's general credibility as part of Rule 702's reliability inquiry, the credibility must relate to the reliability of the methodology at issue, which is the core of the Rule 702 inquiry. 233 F.3d 734, 750–51, 751 n. 8 (3d Cir. 2000); *see also* 29 Charles Alan Wright & Victor Gold, *Federal Practice and Procedure* § 6265.3 (2d ed. 2016).

There is no such relationship in this case. The fact that Dr. Parsons wrote five articles on socialism in the 1980s in no way suggests that he could not reliably testify about the valuation of renewable energy assets. The Claims Court stated that the alleged misrepresentations were "especially dispositive here because Dr. Parsons' untruthfulness related to his writing on economics topics, which was the area in which he was called to testify as an expert." *Alta Wind*, 128 Fed. Cl. at 707. In the same vein,

plaintiffs' counsel argued to the Claims Court that Dr. Parsons "shouldn't be allowed to be an expert in this case" because the question at issue is "Capitalism 101" and Dr. Parsons "despises the capitalist system." J.A. 73322. The articles expressed, for example, that capitalism has "reactionary and destructive features" that "stand[] against clearly defined alternatives for accomplishing the same goals, viz. national economic planning of various forms." J.A. 73316. But there is no relationship between a person's views on socialism and his or her capacity to provide expert testimony regarding the appropriate way to calculate plaintiffs' basis in grant-eligible property.

Other circuits have agreed that an expert's general credibility is not a proper basis for exclusion of expert testimony under Rule 702. *Deputy v. Lehman Bros.*, 345 F.3d 494, 506 (7th Cir. 2003) (holding that the district court erred by excluding expert testimony under Rule 702 based on reasons related to the expert's "credibility and persuasiveness"); *United States v. Vesey*, 338 F.3d 913, 917 (8th Cir. 2003) (concluding that the district court erred by excluding expert testimony based primarily on the expert's "contradictory, evasive, and 'speculative' responses", and noting that doing so improperly "shifted the focus of [the Rule 702] inquiry to the credibility of [the expert]").[10] We agree.

---

[10]  *See also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[T]he question of whether the expert is credible or the opinion is correct is generally a question for the factfinder, not the court."); *Deputy*, 345 F.3d at 506 ("[I]ssues of credibility and persuasiveness . . . are relevant only in valuing the testimony, not in determining its admissibility."); *Elcock*, 233 F.3d at 751 n.8 ("Although *Daubert* assigns to the district court a preliminary gatekeeper function . . . it does not

Plaintiffs further argue that, even if credibility is not generally considered under Rule 702, it may properly be considered in a bench trial, where the judge acts as both gatekeeper and factfinder. But there is nothing in the text of Rule 702 that indicates that the standard may be applied differently in bench trials than it is in jury trials. Even in a bench trial, credibility is determined by the court on the full record, not as a preliminary matter on an abbreviated record, as was the case here. We therefore conclude that the Claims Court erred in excluding Dr. Parsons' testimony under Rule 702.

Even more importantly, the Claims Court erred in excluding the testimony of the government's sole expert without giving the government the opportunity to conduct redirect examination to explain the omission. Treatises indicate that redirect examination is essential for "replying to new matter adduced on cross-examination." 1 Kenneth S. Broun et. al., 1 *McCormick on Evidence* § 32 (7th ed. 2013). Indeed, redirect "[e]xamination for this purpose is often deemed a matter of right." *Id.* In *United States v. Marzano*, for instance, cross-examination revealed that a witness had "failed to disclose on his application for a seat on the Chicago Mercantile Exchange, as required by the application form, that he had been convicted of a crime," 160 F.3d 399, 402 (7th Cir. 1998)—a twelve-year-old misdemeanor that the witness stated he had forgotten, *id.* at 403. On appeal, the Seventh Circuit held that it was error to disallow any explanation of the omitted misdemeanor on redirect, noting that, if the witness had "been allowed to explain the nature of his

---

necessarily follow that the court should be given free rein to employ its assessment of an expert witness's general credibility in making the Rule 702 reliability determination.").

conviction, the credibility of his testimony that he had forgotten it when he filled out the form would have been enhanced. We cannot think of any reason why he was not permitted to explain." *Id.* Other circuits have noted that district courts are "in clear cases required[] to permit a witness to explain on redirect examination what he meant by his answer to a question that had been put to him on cross-examination." *Lust v. Sealy, Inc.*, 383 F.3d 580, 587 (7th Cir. 2004) (collecting cases); *see also Josephs v. Harris Corp.*, 677 F.2d 985, 989–90 (3d Cir. 1982) (holding that it was an abuse of discretion to restrict plaintiffs' ability to address on redirect examination the impression left by cross-examination that plaintiffs' expert had no support for his opinion).

There are several reasons why the opportunity to explain on redirect was particularly important in this case. First, the exclusion of the five articles from the 2016 CV attached to Dr. Parsons' report in this case was permissible under Rule 26(a)(2)(B)(iv), which requires disclosure of "the witness's qualifications, including a list of all publications authored in the previous 10 years." Dr. Parsons' CV satisfied this requirement by providing a complete list of the publications he authored in between 2006 and 2016.

Second, the pre-2006 articles placed under the heading "Research and Publications" could be viewed as of a different character than the five omitted articles. The listed articles all appear to relate to details of business operations—energy project valuation, project financing, and "derivatives and how they're used by companies to hedge their risk," J.A. 73300—as differentiated from articles concerning government economic policy. In other words, the list of articles on Dr. Parsons' CV might have

been prepared by limiting it to those on the subject of his testimony, excluding articles on unrelated subjects.[11]

Third, it has not been shown that anything in the five articles about socialism was inconsistent with the opinions expressed in Dr. Parsons' expert report. And finally, Dr. Parsons' CV does include his academic appointments with East German universities, including his position in 1987 as a visiting scholar at Hochschule für Ökonomie and his affiliation in 1983 and 1986 with Humboldt Universität zu Berlin, which might suggest that he was not attempting to conceal any socialist ties. J.A. 688-75.[12]

---

[11]   The listed articles outside the ten-year period include, for example, "Estimating the Strategic Value of Long-Term Forward Purchase Contracts Using Auction Models," a 1989 article about the contracts used to finance the international natural gas trade; "The Design of Optimal Production Sharing Rules in a Petroleum Exploration Venture," a 1991 article about how to structure mineral rights; and "The Maturity Structure of a Hedge Matters: Lessons from the Metallgesellschaft Debacle," a 1995 analysis of a German company that attempted to hedge risk using crude oil futures. *See* J.A. 688–79; J.A. 73300–01.

[12]   In excluding Dr. Parsons' testimony, the Claims Court relied heavily on the fact that he had omitted the same five articles in an earlier version of his CV attached to an expert report he prepared in 1997. Rule 608(b) permits the court to allow a witness to be cross examined as to specific instances of conduct bearing on their character for truthfulness. Fed. R. Evid. 608(b). In determining whether to permit such cross-examination, however, it is appropriate for the court to consider the remoteness in time of the conduct in question and to view the conduct as less probative of untruthfulness if it happened long in the past. *See* 4 Jack B. Wein-

In short, there were clearly open questions as to Dr. Parsons' reasons for not listing the articles, which the government should have been permitted to explore on redirect. In remanding the case, we express no opinion as to Dr. Parsons' overall credibility or as to whether he properly valued the assets in question.

## IV

While cases are ordinarily remanded to the deciding judge, there are some situations in which reassignment is appropriate to preserve the appearance of fairness. *See Contreras v. Sec'y of Health & Human Servs.*, 844 F.3d 1363, 1369 (Fed. Cir. 2017); *Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 714 F.3d 1289, 1298 (Fed. Cir. 2013); *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1375 (Fed. Cir. 2008); *Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 238 F. App'x 601, 604 (Fed. Cir. 2007) (unpublished decision); *see also Liteky v. United States*, 510 U.S. 540, 554 (1994) ("Federal appellate courts' ability to assign a case to a different judge on remand rests . . . on the appellate courts' statutory power to 'require such further proceedings to be had as may be just under the circumstances.'" (quoting 28 U.S.C. § 2106)). We think that this is one of those rare cases where reassignment is appropriate on remand.

---

stein & Margaret A. Berger, *Weinstein's Federal Evidence*, § 608.22(2)(c)(iv) (Mark S. Brodin, ed., 2d ed. 2018) (describing "[h]ow old the misconduct is" as a relevant factor and citing cases and legislative history to that effect); *see also Johnson v. Elk Lake School District*, 283 F.3d 138, 145 n.2 (3d Cir. 2002) (concluding that the district court did not abuse discretion in barring cross-examination related to misstatements on a witness' resume submitted nine years prior).

CONCLUSION

Because goodwill and going concern value could have attached to the assets transferred in the Alta transactions, I.R.C. § 1060 applies and plaintiffs' basis in grant-eligible assets must be assessed using the residual method. And because credibility is not relevant to the inquiry under Rule 702, and because the government was denied the opportunity for redirect examination, it was error to exclude the testimony of the government's expert. We therefore vacate and remand to the Chief Judge of the United States Court of Federal Claims for reassignment of the case. *See* RCFC 40.1.

## VACATED AND REMANDED

COSTS

Costs to the United States.